IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-122

No. 342PA19-2

Filed 16 December 2022

JABARI HOLMES, FRED CULP, DANIEL E. SMITH, BRENDON JADEN
PEAY, and PAUL KEARNEY, SR.

v.

TIMOTHY K. MOORE, in his official capacity as Speaker of the North
Carolina House of Representatives; PHILIP E. BERGER, in his official
capacity as President Pro Tempore of the North Carolina Senate; DAVID R.
LEWIS, in his official capacity as Chairman of the House Select Committee on
Elections for the 2018 Third Extra Session; RALPH E. HISE, in his official
capacity as Chairman of the Senate Select Committee on Elections for the
2018 Third Extra Session; THE STATE OF NORTH CAROLINA; and THE
NORTH CAROLINA STATE BOARD OF ELECTIONS

On discretionary review pursuant to N.C.G.S. § 7A-31 prior to a determination

by the Court of Appeals of a final judgment and order entered on 17 September 2021

by a three-judge panel of the Superior Court, Wake County appointed by the Chief

Justice following transfer of the matter to the panel pursuant to N.C.G.S. § 1-267.1.

Heard in the Supreme Court on 3 October 2022 in session in the Historic 1767 Old

Chowan County Courthouse in the Town of Edenton pursuant to N.C.G.S. § 7A-10(a).

*Southern Coalition for Social Justice, by Jeffery Loperfido, Allison J. Riggs and
Hilary Harris Klein; and Paul, Weiss, Rifkind Wharton & Garrison LLP, by
Jane B. O'Brien, pro hac vice, Paul D. Brachman, pro hac vice, and Andrew J.
Ehrlich, pro hac vice; for plaintiff-appellees.*

*Cooper & Kirk, PLLC, by Nicole J. Moss, David H. Thompson, pro hac vice,
Peter A. Patterson, pro hac vice, Joseph O. Masterman, pro hac vice, John W.
Tienken, pro hac vice, and Nicholas Varone, pro hac vice; and K&L Gates, by
Nathan A. Huff, for legislative defendant-appellants.*

*Joshua H. Stein, Attorney General, by Terence Steed, Special Attorney General, Laura McHenry, Senior Deputy Attorney General, and Mary Carla Babb, Special Deputy Attorney General for defendant-appellants State of North Carolina and North Carolina State of Board of Elections.*

*Fox Rothschild LLP, by Matthew Nis Leerberg, for Professor Justin Grimmer, amicus curiae.*

*Nelson Mullins Riley & Scarborough, LLP, by Andrew D. Brown, Phillip J. Strach, and John E. Branch III, for Lawyers Democracy Fund, amicus curiae.*

*Roger W. Knight, P.A., by Roger Knight, for National Republican Senatorial Committee, amicus curiae.*

*Kevin Cline Law, PLLC, by Kevin J. Cline; and Philip R. Thomas for North Carolina Republican Party, amicus curiae.*

EARLS, Justice.

The right to vote is a fundamental right, preservative of all other rights. *Blankenship v. Bartlett,* 363 N.C. 518, 522 (2009); *see also Reynolds v. Sims,* 377 U.S. 533, 562 (1964). If the right to vote is undermined, it renders illusory all "[o]ther rights, even the most basic." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964). Therefore, "since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds,* 377 U.S. at 562. But "[f]or much of our Nation's history, that right sadly has been denied to many because of race." *Shaw v. Reno,* 509 U.S. 630, 639 (1993).

¶ 2        Concerning qualifications for students to vote, this Court has recognized the

basic proposition that "any state law which tends to affect the right to vote by way of

making classifications must be scrutinized for conformity with the Equal Protection

Clause" and that "otherwise eligible persons who reside in a community and are

subject to its laws must be permitted to vote there even though their interests may

differ from the majority of the community's residents." *Lloyd v. Babb,* 296 N.C. 416,

440 (1979). Furthermore, as the United States Supreme Court has observed:

> But we must remember that the interest of the State, when
> it comes to voting, is limited to the power to fix
> qualifications. Wealth, like race, creed, or color, is not
> germane to one's ability to participate intelligently in the
> electoral process. Lines drawn on the basis of wealth or
> property, **like those of race** (*Korematsu v. United States*,
> 323 U.S. 214, 216), are traditionally disfavored.

*Harper v. Va. Bd. of Elections*, 383 U.S. 663, 668 (1966) (emphasis added) (first citing

*Edwards v. California*, 314 U.S. 160, 184–185 (1941) (Jackson, J., concurring); then

citing *Griffin v. Illinois*, 351 U.S. 12 (1956); and then citing *Douglas v. California*,

372 U.S. 353 (1963)); *see also United States v. Vaello-Madero*, 142 S. Ct. 1539, 1550

(2022) ("[T]he Constitution of the United States, in its present form, forbids, so far as

civil and political rights are concerned, discrimination by the General Government,

or by the States, against any citizen because of his race. All citizens are equal before

the law." (quoting *Gibson v. Mississippi*, 162 U.S. 565 (1896)). "It has accordingly

been held generally in the States that, whether the particular provisions of an act of

legislation, establishing means for ascertaining the qualifications of those entitled to vote . . . were or were not reasonable regulations, and accordingly valid or void, was always open to inquiry, as a judicial question." *See Yick Wo v. Hopkins*, 118 U.S. 356, 371 (1886) (first citing *Daggett v. Hudson*, 43 Ohio St. 548, 3 N.E. 38 (1885) (collecting cases); *Monroe v. Collins*, 17 Ohio St. 665 (1867)).

¶ 3      The trial court in this case found that Senate Bill 824 (S.B. 824), the statute enacted to require that every voter present one of a few specific forms of photo identification, was enacted with a racially discriminatory purpose. Plaintiffs challenged S.B. 824, which requires a photo identification (ID) to vote, under article I, section 19, of the North Carolina Constitution, alleging the law was enacted at least in part with the intent to discriminate against African-American voters. While most people who have one of the acceptable forms of photo identification do not run the risk of being disenfranchised by this statute, the experiences of plaintiffs and other witnesses at trial showed that for themselves and others like them, the risk of disenfranchisement is very real. But the guarantee of equal protection of the laws means that a law enacted with the intent to discriminate on the basis of race is unconstitutional even if no voter ultimately is disenfranchised because "[r]acial classifications of any sort pose the risk of lasting harm to our society. They reinforce the belief, held by too many for too much of our history, that individuals should be

judged by the color of their skin. Racial classifications with respect to voting carry particular dangers." *Shaw*, 509 U.S. at 657.

¶ 4     The question before this Court is whether the three-judge panel's finding that S.B. 824 was motivated by racial discrimination is supported by competent evidence in the record and whether the trial court correctly applied the *Arlington Heights* factors when it found S.B. 824 was enacted at least in part with racially discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977); *see also, Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) (a finding of purposeful racial discrimination is a finding of fact not to be overturned unless clearly erroneous and "[t]reating issues of intent as factual matters for the trier of fact is commonplace.") We hold that the three-judge panel's findings of fact are supported by competent evidence showing that the statute was motivated by a racially discriminatory purpose, and that the trial court correctly applied the *Arlington Heights* factors to the specific facts of this case. *See Vill. of Arlington Heights*, 429 U.S. at 265–68. By applying well-settled law concerning how the right to equal protection is secured under article I, section 19 of the North Carolina Constitution, the trial court's ruling does not mean that any voter ID law enacted in North Carolina would violate the equal protection guarantee, only that the provisions enacted by this General Assembly in S.B. 824 were formulated with an impermissible

intent to discriminate against African-American voters in violation of the North

Carolina Constitution.

## I. Background

Based on the evidence before it, the trial court found that voting in North Carolina is currently, and has been historically, racially polarized.[1] In recent years, white voters have favored the Republican Party, while the majority of African-American voters have favored the Democratic Party. As the trial court and Court of Appeals noted, this polarization "offers a political payoff" for legislators to dilute or limit the minority vote." *Holmes v. Moore,* 270 N.C. App. 7, 22 (2020) (cleaned up); *see Thornburg v. Gingles,* 478 U.S. 30, 62–63 (1986) (plurality) (explaining that polarization renders minority voters uniquely vulnerable to elected officials who can entrench themselves by targeting groups unlikely to vote for them). Because of the nature of racially polarized voting in North Carolina, if the State enacts restrictions on voting and procedures that weigh more heavily on African-American voters, this practice will "predictably redound to the benefit of one political party and to the disadvantage of the other." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (cert denied sub nom. *North Carolina v. N.C State Conf. of the*

---

[1] The conclusion that voting is racially polarized is based on sound political science methodologies analyzing actual election returns, methods that were endorsed by the United States Supreme Court thirty-six years ago in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and have been routinely accepted by courts throughout the country since then.

*NAACP*, 137 S. Ct. 1399 (2017)). North Carolina also has a long history of race discrimination generally and race-based voter suppression in particular. Although laws that limit African-American political participation have frequently been race-neutral on their face, they have "nevertheless had profoundly discriminatory effects." Thus, equal access to the ballot box remains a critical issue in North Carolina.

¶ 6    North Carolina has also experienced a historical pattern in which increased political participation by African-American voters is followed by attempts to thwart or limit the same. One such example was found in H.B. 589. By 2013, after years of expansion of voting access and preclearance requirements, African- American voting registration and turnout rates began to resemble white registration and turnout rates. The day following the United States Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which eliminated preclearance requirements, the North Carolina legislature unveiled new omnibus election law changes. This effort resulted in the adoption of H.B. 589, which included a voter identification requirement. *McCrory*, 831 F.3d at 214. When drafting H.B. 589, lawmakers sought data on voter turnout disaggregated by race, and the bill ultimately required forms of photo identification that African-American voters disproportionately lacked. *Id.* at 216. In 2016, the Court of Appeals for the Fourth Circuit reviewed H.B. 589 in *McCrory* and concluded that the measure had been enacted with the unconstitutional discriminatory intent to target African-American voters because they were unlikely

to vote for the Republican legislative majority. The United States Supreme Court denied Certiorari in *McCrory* in May 2017, thus ending the litigation over H.B. 589. *See North Carolina v. N. Carolina State Conf. of NAACP*, 137 S. Ct. 1399 (Mem) (2017).

¶ 7     A little over a year later in 2018, and following the United States Supreme Court's final decision in *North Carolina v. Covington*, 138 S. Ct. 2548 (2018), which conclusively established that North Carolina's racially gerrymandered districts would need to be redrawn, Republican leadership in the General Assembly voted to place a proposed constitutional amendment requiring voter photo identification on the November 2018 general election ballot. This proposed constitutional amendment, embodied in H.B. 1092, was enacted more quickly than other bills proposing constitutional amendments and was not accompanied by legislation necessary to implement the amendment if it met voter approval. Because voters were not provided with implementing legislation, North Carolinians were not able to consider the potential significance or impact the constitutional amendment would have. Specifically, the voters did not receive details regarding the kinds of identification that would be required if the amendment passed.

¶ 8     North Carolina voters approved H.B. 1092, while simultaneously electing a sufficient number of Democrats to the General Assembly to eliminate the Republican supermajority in both houses. Thus, in order to enact the voter ID law, S.B. 824, in

its preferred form and before Republicans lost their supermajority, the General Assembly reconvened in a post-election lame duck session to consider the law's implementing legislation. This scenario occurred despite the fact that enabling legislation for another constitutional amendment approved during the same election passed the following year after newly elected legislators took their seats and Republicans lost their supermajority. S.B. 824 was enacted over Governor Cooper's veto on 19 December 2018. Plaintiffs Jabari Holmes, Fred Culp, Daniel E. Smith, Brenden Jaden Peay, and Paul Kearney, Sr. immediately challenged the law, alleging it violated the Equal Protection Clause in article I, section 19 of the North Carolina Constitution because it was enacted with intent to discriminate against voters of color, including African-American voters. That same day, plaintiffs also filed a motion for a preliminary injunction seeking to prevent implementation of S.B. 824. Legislative and State defendants (defendants) moved to dismiss the action on 22 January 2019 and 21 February 2019, respectively. The court denied legislative defendants' motion to dismiss plaintiffs' claims I and II pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure.

The Chief Justice of the Supreme Court of North Carolina transferred the case to a three-judge panel to consider the remaining challenges and request for injunctive relief. On 19 July 2019, the three-judge panel granted the motions to dismiss in part and also denied the motion for preliminary injunction. Although the trial court found

that plaintiffs had "made sufficient factual allegations to support" that defendants intentionally enacted a racially discriminatory law in violation of article I, section 19 of the North Carolina Constitution, it dismissed the remaining constitutional challenges. In denying plaintiffs' request for a preliminary injunction, the two-judge majority of the panel noted only that plaintiffs failed to demonstrate a likelihood of success on the merits of their claim that S.B. 824 violated their equal protection rights under article I, section 19 of the North Carolina Constitution. Judge O'Foghludha dissented in part stating that a preliminary injunction was warranted because plaintiffs had shown a reasonable likelihood of success on the merits of their intentional discrimination claim.

¶ 10        Plaintiffs sought review of the trial court's interlocutory order denying their preliminary injunction motion. On 30 August 2019, plaintiffs requested that this Court grant discretionary review prior to a determination by the Court of Appeals; however, this Court denied the petition. On 18 February 2020, the Court of Appeals issued a unanimous decision reversing the trial court, holding that plaintiffs had shown a likelihood of success on their discriminatory intent claim and that they were "likely to sustain irreparable loss unless the injunction [was] issued." *Holmes*, 270 N.C. App at 34, 35 (cleaned up). Accordingly, the Court of Appeals directed the trial court to enter a preliminary injunction barring implementation of S.B. 824 until a determination on the merits was made. *Id.* at 36. Legislative defendants filed a

motion for rehearing en banc which the Court of Appeals denied on 24 March 2020 and the case was remanded back to the trial court. *Holmes v. Moore*, No. 19-762 (N.C. App. Mar. 24 2020) (order denying motion for rehearing en banc).

¶ 11        On 10 August 2020, the three-judge panel entered an order in accordance with the Court of Appeals decision preliminarily enjoining implementation of S.B. 824. *Holmes v. Moore*, No. 18 CVS 15292 (N.C. Super. Ct. Wake County Aug 10, 2020). In reaching its final decision in this case, the three-judge panel held a three week trial, and created a lengthy six volume record, of over one thousand pages, which included extensive discovery from both parties.

¶ 12        On 17 September 2021, the three-judge panel entered its final judgment, in a one hundred five page order, permanently enjoining operation of S.B. 824 because it violated the Equal Protection Clause in article I, section 19 of the North Carolina Constitution. The majority of the three-judge panel found "the evidence at trial sufficient to show that the enactment of S.B. 824 was motivated at least in part by an unconstitutional intent to target African American voters," even if no member of the General Assembly "harbor[ed] any racial animus or hatred towards African American voters." The majority noted that, "as with H.B. 589, . . . the Republican majority 'target[ed] voters who, based on race, were unlikely to vote for the majority party' " and "[e]ven if done for partisan ends, [this] constitut[ed] racial discrimination." (first alteration in original) (quoting *McCrory*, 831 F. 3d at 233)

Moreover, the majority concluded that defendants "failed to prove . . . that S.B. 824 would have been enacted in its present form if it did not tend to discriminate against African American voters." Specifically, the court noted that a less restrictive voter ID law would have been sufficient to achieve the legitimate non-racial purposes provided by defendants, namely, implementing the constitutional amendment requiring voter ID, deterring voter fraud, and enhancing voter confidence. State and Legislative defendants appealed, and this Court granted discretionary review prior to a determination by the Court of Appeals on 2 March 2022.

## II. Standard of Review

A challenge to the constitutionality of a statute is reviewed de novo. *Cooper v. Berger*, 376 N.C. 22, 56 (2020). When the trial court conducts a trial without a jury, "the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even [if] the evidence could be viewed as supporting a different finding." *In re Estate of Skinner*, 370 N.C. 126, 139 (2017) (quoting *Bailey v. State*, 348 N.C. 130, 146 (1998)). Findings of fact that are "supported by competent, material and substantial evidence in view of the entire record, are conclusive upon a reviewing court and not within the scope [of its] reviewing powers[.]" *Id.* at 139 (quoting *In re Revocation of Berman*, 245 N.C. 612, 616–17 (1957)).

### III. *Arlington Heights* **Factors**

¶ 14    "[T]he principle of the equal protection of the law, made explicit in the Fourteenth Amendment to the Constitution of the United States . . . has now been expressly incorporated in Art. I, § 19, of the Constitution of North Carolina . . ." *S. S. Kresge Co. v. Davis,* 277 N.C. 654, 660 (1971). Thus, while our state constitution requires in-person voters to "present photographic identification before voting," and it is the General Assembly's duty to enact voter ID laws to implement that requirement, N.C. Const. art. VI, §§ 2(4), 3(2), the North Carolina Constitution also demands that "[n]o person . . . [be] subjected to discrimination by the State because of race, color, religion, or national origin," *id.* art. I, § 19.  North Carolina's guarantee of equal protection has also been held to be more expansive than the federal right. *See Stephenson v. Bartlett,* 355 N.C. 354, 380-81, n 6 (2002) (stating that "this Court has the authority to construe the State Constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision") (quoting *State v. Carter*, 322 N.C. 709, 713 (1988); *Blankenship v. Bartlett,* 363 N.C. 518, 526 (2009) (holding that "the right to vote in superior court elections on substantially equal terms is a quasi-fundamental right which is subject to a heightened level of scrutiny"). It is clear that the "central purpose [of the Equal Protection Clause] is to prevent the States from purposefully

discriminating between individuals on the basis of race." *Shaw,* 509 U.S. at 642 (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). That same purpose has been incorporated into article I, section 19, of the Constitution of North Carolina.

¶ 15      We hold, and both parties agree, that to determine whether a law that is race-neutral on its face nevertheless is motivated by a racially discriminatory purpose in violation of article I, section 19 of the North Carolina Constitution, this Court should apply the same analysis adopted by the United States Supreme Court in V*illage of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In *Arlington Heights*, the United States Supreme Court identified a non-exhaustive list of factors relevant to analyzing whether a law was passed with discriminatory intent. *Id.* at 265–268. Those factors include: (1) "[t]he impact of the [law]" and "whether it bears more heavily on one race than another"; (2) the law's "historical background"; (3) "[t]he specific sequence of events leading up to the challenged decision"; (4) "departures from the normal procedural sequence"; (5) "[s]ubstantive departures" from the normal process; and (6) the "legislative or administrative history" of the decision. *Id. at* 266–68 (quoting *Washington v. Davis*, 426 U.S. at 242). Under this test, even a seemingly neutral law violates the equal protection standard if its enactment was motivated by "racially discriminatory intent or purpose." *Id.* at 265. Discriminatory intent does not need to be the "primary" reason the law was enacted, nor is racial animus required for a law to be invalidated. *See McCrory,* 831

F.3d at 229. If racial discrimination was a motivating factor in passing the law, the law will be found unconstitutional. *Arlington Heights*, 429 U.S. at 265–66.

The *Arlington Heights* factors are also part of a burden-shifting framework which requires the reviewing court to grant judicial deference to a legislative body unless there is proof that a discriminatory purpose was a motivating factor in the challenged decision. *Id*. at 266. More recently, in *Abbott v. Perez*, 138 S. Ct. 2305 (2018), the Supreme Court explained that the first step in the burden-shifting analysis is that the "good faith of [the state] legislature must be presumed." *Id*. at 2324 (cleaned up). But if discriminatory purpose is established, "judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 266.

## A. The Impact of S.B. 824 on African-American Voters

The United States Supreme Court has made clear that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id*. at 264–65 (citing *Washington v. Davis*, 426 U.S. 229 (1976)). Yet "[d]isproportionate impact is not irrelevant," *id*. at 265 (quoting *Washington v. Davis*, 426 U.S. at 242), and determining "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *id*. at 266. Accordingly, "[t]he impact of the official action– whether it 'bears more heavily on one race than another'– may provide an important starting point" for this analysis. *Id*. at 266 (quoting *Washington v.*

*Davis*, 426 U.S. at 242). An "overwhelming" disparate impact is not needed to show discriminatory intent. *McCrory*, 831 F.3d at 231. In this case, evidence that voters of color disproportionately lack the forms of ID required under S.B. 824 is sufficient to show disparate impact. *Id.*

¶ 18        The trial court considered an analysis by plaintiffs' expert Kevin Quinn which showed that, similarly to H.B. 589, S.B. 824 was very likely to have a disproportionate impact on African-American voters. Especially pertinent was evidence showing that African-American voters are approximately 39% more likely than white voters to lack forms of ID qualifying under S.B. 824. Defendants argued that S.B. 824's ameliorative provisions, the reasonable impediment process, and the availability of free IDs mitigated the disparate impact of S.B. 824 on African- American voters. But the trial court, relying on *McCrory*, concluded that determining whether portions of the law had an ameliorative effect and reduced S.B. 824's impact on African-American voters was the incorrect standard to apply. 831 F.3d at 231. Instead, because plaintiffs do not need to show an "overwhelming impact," whether portions of the law reduce S.B. 824's disparate effect does not mean that sufficient disparate impact fails to exist. *Id.* Rather, because some disparate impact exists and plaintiffs have come forward with evidence of discriminatory intent, these factors must be considered under an *Arlington Heights* analysis. The trial court acknowledged that some of the data used to determine the impact of S.B. 824 come from a previous examination of the effect of

H.B. 589. In doing so, the trial court stated that although it is possible that the disparities in ID possession rates could be lower under S.B. 824 than under H.B. 589, this variance does not change or affect the conclusion that disparate impact exists. Under *Arlington Heights*, the appropriate question is simply whether S.B. 824 "bears more heavily" on African-American voters. 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. at 242).

¶ 19      Importantly, the trial court found that it did not need to find definitively that S.B. 824 would in fact disenfranchise African-American voters if the law went into effect. Whether African-American voters are able to overcome the barriers S.B. 824 disproportionately places in their path does not change the fact that disparate impact exists, nor does it change the intent of the North Carolina General Assembly in passing the law.

¶ 20      Here the trial court determined a disparate impact existed, finding as a fact that the ameliorative provisions of the statute did not have their purported effect. First, the court found that evidence showed that for some voters, obtaining a qualifying ID, even a free ID, would not actually be cost-free or burden-free. And these burdens would weigh more heavily on African-American voters. For example, Jabari Holmes, one of the named plaintiffs, would face significant obstacles in obtaining a free ID card because of his disabilities and his family's income status.  East Wake High School where Jabari's family votes, is only two and one-half miles from their

home, and a short ten minute drive. But the Wake County Board of Elections office, where Jabari would need to go to obtain a free photo ID, is eleven and one-half miles from his home and is a much longer drive, which creates a greater risk that Jabari will experience discomfort because of his disabilities. Also because of his disabilities, Jabari only leaves his home a few times a week, almost always for a medical appointment. In the past, Jabari's mother had paid a family friend to take Jabari on social outings, like the mall or to the movies once or twice a week. These outings only occurred in the summer because the family friend was a teacher who worked during the school year. In order for Jabari to obtain an acceptable ID his mother would potentially need to pay someone to take him to the Wake County Board of Elections. Based on these facts, the trial court noted that paying someone to take Jabari to the Wake County Board of Elections and obtain an ID would deplete funds set aside for Jabari's current and future care. Thus, for Jabari and others like him, a "free ID" would not actually be cost or burden free.

¶ 21        The trial court also found that the reasonable impediment declaration process did not eliminate the disparate impact of the law.[2] The trial court examined data from H.B. 589's similar reasonable impediment provision which was in effect during the

---

[2] The dissent states we "mischaracterize" S.B. 824 because it specifically states "[a]ll registered voters will be allowed to vote with or without a photo ID card." *See* S.B. 824 § 1.5(a)(10). In doing so, the dissent fails to appreciate the distinction between being able to legally cast a vote and having that vote actually counted. Mr. Smith and Mr. Kearney's experiences, detailed below, illustrate this principle.

March 2016 primary. This data showed that H.B. 589's reasonable impediment provision was "not uniformly provided to voters, and the process is susceptible to error and implicit bias." For example, the trial court found the specific experiences of plaintiffs Daniel Smith and Paul Kearney to be significant. Both Mr. Smith and Mr. Kearney were not given proper instruction on how to complete a reasonable impediment ballot during the March 2016 primary. In Mr. Smith's case, he had misplaced his regular driver's license and accordingly sought a temporary license from the Department of Motor Vehicles (DMV). From his conversation with workers at the DMV, Mr. Smith believed he could use his temporary license in the same manner as his regular license. But when Mr. Smith arrived at his polling place and presented his temporary driver's license, he was asked to step out of line while the poll workers discussed whether his temporary driver's license could be used to vote. This was both frustrating and embarrassing for Mr. Smith. Meanwhile, the poll workers appeared to be confused and admitted they were unsure whether Mr. Smith could use his temporary license to vote. Although a reasonable impediment declaration was available, that option was not offered to Mr. Smith, nor was he told he could use a reasonable impediment declaration to vote. Instead, Mr. Smith was offered a provisional ballot, which needed to be cured before it could be counted. Because Mr. Smith had never cast a provisional ballot, he was unaware of this requirement, and since that process was not explained to him, his vote was not

counted.

¶ 22    Mr. Kearney had a similar experience when he arrived at his local polling place to vote. Although Mr. Kearney had a valid ID, he was unable to bring it with him on election day due to an emergency on his farm. When he informed the poll workers of this situation, he was told "they would need to make some arrangements for him to vote," and he was given a provisional ballot; however, he did not receive any information regarding the need to follow up with the county board of elections to ensure his vote was counted. Furthermore, even though a reasonable impediment declaration was available, Mr. Kearney was not provided with the applicable form nor was he advised he could use it. Following the 2016 primary election, Mr. Kearney was disheartened to learn his vote was not counted.

¶ 23    Based on this and other evidence, the court found that the reasonable impediment process could be confusing to voters and deter them from voting. Specifically, the trial court noted that a hesitant or infrequent voter may be deterred from voting via a reasonable impediment declaration because the process is unfamiliar or because it appears the voter is being treated differently from everyone else at the polls. As an example, the court identified Alamance County, where voters who are offered provisional ballots sometimes choose not to vote at all. Taking this all together, the court found that because African-American voters were more likely to lack an approved ID at higher rates than white voters, they would be

disproportionately impacted by these shortcomings in the reasonable impediment process.

¶ 24      Despite the trial court's findings to the contrary, defendants argue that S.B. 824 does not disparately impact African American voters because the statute "goes out of its way to make its impact as burden free as possible." *See Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016) (concluding that Virginia's photo voter ID law went "out of its way to make its impact as burden-free as possible"). To support this contention, defendants provide case examples from across the country in which a court has found voter ID laws constitutional because those laws included provisions that sufficiently mitigated the disparate impact created by the law. *See, e.g.*, *id.*; *South Carolina v. United States*, 898 F. Supp. 2d 30, 32, 40 (D.D.C. 2012) (upholding a voter ID law despite acknowledging a racial disparity in ID possession rates in South Carolina); *Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018) (reversing a preliminary injunction barring implementation of a voter ID law because the lower court had failed to account for the reasonable impediment provision); *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) (vacated in part, 819 F.3d 384 (7th Cir. 2016) (reversing an injunction barring implementation of a Wisconsin photo ID law that did not have a reasonable impediment provision)). But this analysis is not the one contemplated by the United States Supreme Court in *Arlington Heights*. For under *Arlington Heights* it matters not if other laws have been upheld in other

jurisdictions and in other circumstances, instead, what matters is whether under the facts and circumstances present in the current case, under the specific pressures North Carolina faces, the challenged law "bears more heavily on one race than another." 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. at 242) (analyzing a denial of rezoning by the Village of Arlington Heights to determine whether this action was motivated by discriminatory intent).

¶ 25 State defendants also argue that the trial court did not give enough weight to S.B. 824's purported ameliorative provisions; however, this argument requires this Court to usurp the trial court's fact-finding function. Here the trial court carefully analyzed S.B. 824, through receiving and considering testimony supporting that S.B. 824 has a disparate impact on African-American voters and that the purported ameliorative provisions do not have an ameliorative effect.

¶ 26 Importantly, the trial court also properly determined that it did not need to find definitively that S.B. 824 would in fact disenfranchise African-American voters if the bill were allowed to go into effect. This is because even if African-American voters are able to overcome the barriers that S.B. 824 disproportionately places in their path and they cast a ballot that is counted, racially disparate impact still exists. Nor does African-Americans' ultimate success in voting necessarily mean that this factor, when taken into consideration with the other *Arlington Heights* factors, does not tend to show that the law was enacted with the intent to deter and discourage the

political participation of African-American voters.[3]

¶ 27        Here the trial court's findings regarding the disparate impact of S.B. 824 are supported by testimony that the purported ameliorative provisions fail to have an ameliorative effect. Thus, we hold that the evidence considered by the trial court supports its conclusion that S.B. 824 has a disparate impact and that this impact "bears more heavily on one race than another," namely on African-American voters. *See Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. at 242). We also hold that, although disparate impact is only one portion of the *Arlington Heights* analysis, which on its own cannot support an inference of discriminatory intent, when combined with the factors explained in more detail below, the court's findings of disparate impact support an inference that S.B. 824 was passed with the impermissible discriminatory intent to target African-American voters.

---

[3] In this context, a racially discriminatory impact is only one element of the *Arlington Heights* standard, not a prerequisite. To be sure, "[t]he question of whether discriminatory intent can, by itself, without discriminatory effect, violate the constitution presents a somewhat odd hypothetical that could be described as the 'incompetent discriminator'—the actor who *intends* to discriminate but fails to actually do so effectively." Dale E. Ho, *Voting rights litigation After* Shelby County*: Mechanics and Standards in Section 2 Vote Denial Claims*, 17 N.Y.U. J. Legis. & Pub. Pol'y 675, 695 n.80. However, that is not the issue raised by this case. Here defendants dispute the weight the trial court gave to this factor, but the trial court's findings were supported by evidence in the record. In *Arlington Heights*, the Court stated that finding an Equal Protection violation requires "proof of racially discriminatory intent" and that although disproportionate impact is not "irrelevant," it is "not the sole touchstone of an invidious racial discrimination." 429 U.S. at 265 (quoting *Washington v. Davis*, 426 U.S. at 242).

### B. Historical Background of S.B. 824

¶ 28    "The historical background of [a] decision is one evidentiary source [used to prove intentional discrimination], particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267. Furthermore, "[an] historical pattern of laws producing discriminatory results provides important context for determining whether the same decision-making body has also enacted a law with discriminatory purpose." *McCrory*, 831 F.3d at 223–24.

¶ 29    "Just as with other states in the South, 'North Carolina has a long history of race discrimination generally, and race-based voter suppression in particular.' " *Holmes*, 270 N.C. App. at 20–21 (quoting *McCrory*, 831 F. 3d 223). The trial court concluded that the historical context in which the General Assembly enacted S.B. 824 supported the inference that the measure had been passed with the intent to discriminate against African-American voters. The trial court based this conclusion on extensive testimony by expert historians who explained that there is a recurring pattern in North Carolina in which expansion of voting rights and ballot access for African-Americans is followed by the enactment of facially neutral laws that both intend to, and have the effect of, diluting African-American votes. The trial court found this pattern had repeated itself at least three times in North Carolina history.

¶ 30    In 1868 the North Carolina Constitution guaranteed every male adult citizen the right to vote. This guarantee resulted in an increase in African-American political

participation from Reconstruction to the end of the nineteenth century; however, this situation was short-lived because Democrats implemented and passed an amendment to the North Carolina Constitution to require a literacy test and payment of a poll tax in order to vote. This enactment resulted in the disenfranchisement of many African-American North Carolinians and their removal from political participation in our State. Yet, despite the literacy tests, poll taxes, and Jim Crow laws, African-American voters achieved some hard won political success through mobilizing African-American community members to challenge the literacy tests through repeated efforts to pass it. As a result, by the mid-1950s, approximately a dozen African-American officials were elected in North Carolina at the municipal and county levels.

¶ 31        Nonetheless, in the 1950s and 1960s, in an effort to thwart African American political power, the North Carolina General Assembly enacted at-large, multimember districts and prohibited single-shot voting. These measures were not passed as part of one single piece of legislation and instead were implemented in a "piecemeal fashion" under the guise of voter fraud protections. These provisions ended the election of African-American candidates at the local level, and by 1971 there were only two African-American lawmakers in the General Assembly. It is important to note that in *Stephenson v. Bartlett*, 355 N.C. at 376–77, this Court explained that "[a]lthough the United States Supreme Court has held that multi-member districts

are not *per se* invalid under the federal Equal Protection Clause," (first citing *Whitcomb v. Chavis*, 403 U.S. 124, 142 (1971); the Court has "recognized that multi-member districts may well 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population," and then quoting *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965)).

¶ 32        After the Voting Rights Act of 1965 was passed and judicial intervention enforced the Act, states were forced to remove the barriers to African American voting that had been implemented during the 1950s and 1960s. During this time, the North Carolina General Assembly passed laws that increased access to voting, such as early voting, out-of-precinct voting, same day registration, and pre-registration for teens with driver's licenses, which collectively increased African-American voter registration by fifty percent. Yet, efforts to suppress African-American voting did not end. For example, in 1990, the State Republican party sent postcards to voters in majority African-American precincts falsely warning these voters that they would not be allowed to vote if they had moved within thirty days. The postcards also incorrectly stated that if those who had moved within the last thirty days attempted to vote, they would be subject to prosecution and imprisonment.

¶ 33        From 2000 to 2012, African-American voter registration increased by 51.1 % and African-American voter turnout increased from 41.9 % in 2000 to 71.5 % in 2008. In the 2008 and 2012 elections, and for the first time in North Carolina history,

African-American voters registered to vote at rates higher than white voters. Since 2010, Republicans have controlled both chambers of the General Assembly, and for three of the five legislative terms since the 2010 election, the Republican majorities were supermajorities, meaning there would be sufficient Republican votes to override a gubernatorial veto.

¶ 34        The 2008 presidential election demonstrated the effect of racially polarized voting in North Carolina. There the Democratic presidential candidate, Barack Obama, won North Carolina by only 14,171 votes out of 4,271,125 ballots cast. President Obama received ninety-five percent of the African-American vote in this state. But this most recent expansion of African-American political participation was again met with additional attempts at voter suppression. In 2011, the Republican majority ratified H.B. 351, which required a photo ID to vote; however, this bill was vetoed by Governor Beverly Perdue because "as written [it would have] unnecessarily and unfairly disenfranchise[d] many eligible and legitimate voters."

¶ 35        In early 2013, before enacting H.B. 589, Republican legislators in the General Assembly sought voter turnout data disaggregated by race. H.B. 589 was passed immediately following the U.S. Supreme Court decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which invalidated the Voting Rights Act's coverage formula and effectively ended the Act's Section 5 preclearance requirements. Although H.B. 589 did not evidence racial discrimination on its face, its provisions targeted the voting

mechanisms that had previously increased African-American voter turnout. In particular, H.B. 589 required specific forms of ID that African-Americans were more likely to lack, eliminated the first week of early voting, including same day registration, straight-ticket voting, and pre-registration for teenagers in high school, and repealed other provisions which had previously been used to expand access to the ballot box. Finally, H.B. 589 also revised the rules for challenging voters' eligibility to cast a ballot, which some believed "increased the potential for voter intimidation and echoed Reconstruction–and Jim Crow–era attempts to undermine Black voter participation." In 2016, the Court of Appeals for the Fourth Circuit invalidated H.B. 589 in *McCrory*, concluding that H.B. 589 had been enacted with the unconstitutional discriminatory intent to target African-American voters. *McCrory*, 831 F.3d at 241–42.

¶ 36 The trial court found that even after H.B. 589 was invalidated, attempts to suppress African-American votes continued with the executive director of the state Republican Party encouraging county boards of elections to reduce the number of early voting sites and the hours they were open. Because H.B. 589 had been invalidated, there was no legal authority to shorten the early voting period, but the same effect could be achieved by, reducing access via cutting the number of early voting sites and their hours of operation.

¶ 37 The trial court also found that this continuing pattern in which increased

African-American political participation was followed by attempts to suppress the same was motivated, at least in part, by the racially polarized nature of voting in North Carolina. Indeed, the trial court explained that given this demographic information, "it would be rational to expect a political party to pursue policies that would entrench its own control by targeting African American voters if those voters vote reliably for the opposition party."

¶ 38 State defendants argue that under *Abbott v. Perez*, past discrimination alone cannot condemn governmental action that is not itself unlawful. 138 S. Ct. at 2324. While this is true, *Abbott* subsequently noted that "the 'historical background' of a legislative enactment is 'one evidentiary source' relevant to the question of intent." *Id.* at 2325 (quoting *Arlington Heights*, 429 U.S. at 267). In this case the trial court considered S.B. 824's historical background among the other factors identified by the Court in *Arlington Heights*. *See* 429 U.S. at 265–268. Thus, there is no evidence that the trial court based its analysis on North Carolina's history of race-based discrimination alone but instead correctly followed the analysis in *Arlington Heights*, using the historical background of the law as one piece of circumstantial evidence. *See id.* at 267.

¶ 39 State defendants also argue that because S.B. 824 was passed in response to a constitutional amendment requiring the General Assembly to enact a voter ID law, this circumstance should break the link to North Carolina's history of discriminatory

laws, namely, between H.B. 589 and S.B. 824. In making this argument, State defendants cite to *North Carolina State Conference of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020), which determined that the constitutional amendment at issue "served as an independent intervening event between the General Assembly's passage of [H.B. 589] and its enactment of [S.B. 824]." *Id.* at 305. There the Fourth Circuit stated that because the people of North Carolina had passed the constitutional amendment, thus "interject[ing] their voice into the process [and] mandating that the General Assembly pass a voter-ID law," the link between the General Assembly's passage of the 2013 voter ID law and this voter ID law had been broken. *Id.* While it is true that the people of North Carolina voted for an amendment, imposing a voter ID requirement, there is no evidence the voters intended for the law to be passed in its current form. In fact, the trial court made findings of fact that because no implementing legislation accompanied the amendment voters did not know the specifics of how the law would be implemented before casting their vote. Furthermore, the analysis described in *Arlington Heights* required the trial court to make findings of fact and consider S.B. 824's historical background independent of any constitutional amendment that may have required the law's passage. *See Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."). The trial court faithfully adhered to this analysis.

¶ 40        Furthermore, although we acknowledge that the Fourth Circuit's ruling in

*Raymond*, 981 F.3d 295 (4th Cir.), determined that the sequence of events leading to

S.B. 824's enactment, as well as its legislative history and disparate impact did not

support finding discriminatory intent, that case is neither controlling nor persuasive

authority because it is based on an entirely different factual record. *See id*. at 305.

The *Raymond* Court did not have the benefit of the many lay and expert witnesses

who presented evidence to the trial court in this case.[4]  Here, the trial court's ruling

was based on a full and final record, which was the result of extensive discovery, and

a three-week bench trial complete with the testimony of multiple witnesses. In

contrast, *Raymond* was based on a preliminary pre-trial record. *Raymond*, 981 F.3d

at 301. Thus, *Raymond* is not instructive because even though *Raymond* reviewed

the same voter ID law, S.B. 824, and determined the law was not passed with racially

discriminatory intent, it is impossible to know if the Fourth Circuit would have

---

[4] For example, the court in *Raymond* did not have the benefit of the following evidence when it determined S.B. 824 was not passed with discriminatory intent: (1) The expert testimony of Sabra Faires discussing the ways the sequence of events leading to S.B. 824's passage and its legislative history were unusual; (2) the expert testimony of Dr. Kevin Quinn showing the disproportionate rates at which African American voters lacked qualifying ID compared to white voters and how the IDs added under S.B. 824 failed to remediate that disparity; (3) the expert testimony of Dr. Ariel White discussing the disproportionate impact of reasonable impediment provisions, similar to S.B. 824's, on African American voters; (4) the testimony from multiple legislator witnesses, including supporters and opponents of S.B. 824; (5) the testimony from Dr. Callanan, defendant's expert witness, confirming that the Republican supermajority acted during the lame duck session and that it would be rational to expect a party in power to entrench itself by enacting laws targeting African American voters if those voters reliably cast ballots for the opposition.

reached the same conclusion with the benefit of the record before the trial court in this case.

¶ 41 Defendants also argue the trial court ignored *Arlington Heights*' burden-shifting requirement which affords the legislature judicial deference unless discriminatory intent has been proved. Specifically, they argue that when the trial court analyzed S.B. 824's history, which included a history of racially discriminatory voting laws including H.B. 589, it impermissibly shifted the burden to the defendants. They argue it was improper to consider the extent to which legislators involved in enacting those prior laws were also involved in enacting S.B. 824. But neither *Arlington Heights* nor *Abbott v. Perez* precludes this analysis. In *Abbott v. Perez*, the Court expressly acknowledged that historical evidence is a relevant part of the *Arlington Heights* analysis, *Abbott*, 138 S. Ct. at 2324 (citing *Arlington Heights*, 429 U.S. at 267), and perhaps more importantly, that as part of this analysis, history can be used as one source of evidence to rebut and overcome a presumption of legislative good faith. *See id.* at 2324–25 (citing *Arlington Heights* 429 U.S. at 267); *Arlington Heights*, 429 U.S. at 265–66 (enumerating the factors relevant to analyzing whether discriminatory intent exists and stating that if there is "proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified"). Thus, under both *Arlington Heights* and *Abbott,* it was proper for the trial court to consider that legislators who previously voted for H.B. 589 were aware of the

racial disparities in ID possession rates and that, based on that information, they would understand that S.B. 824 could likewise disproportionately impact African-American voters.

¶ 42 Accordingly, we hold that the trial court not only applied the correct legal standard when analyzing S.B. 824's historical background, but that the court's findings of fact are supported by competent evidence in the record. Thus, we hold that the historical background of S.B. 824 supports the finding that S.B. 824 was passed with the discriminatory intent to target African-American voters. In doing so, we make clear that, while on its own, the historical background of a law cannot condemn lawful actions by the legislature, *Abbott v. Perez*, 138 S. Ct. at 2324, taken together with the other *Arlington Heights* factors, the historical background here supports the inference that S.B. 824 was enacted with discriminatory intent.

**C. The Sequence of Events Leading to S.B. 824's Enactment**

¶ 43 Under the *Arlington Heights factors*, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." 429 U.S. at 267. Furthermore, "[d]epartures from the normal procedural sequence" can be "evidence that improper purposes are playing a role," *id.* and the legislature does not need to "break its own rules to engage in usual procedures," *McCrory*, 831 F.3d at 228.

¶ 44 The trial court determined that the way in which S.B. 824 was passed

"show[ed] an intent to push through legislation prior to losing [Republican] supermajority status and over the governor's veto." On 29 June 2019, the North Carolina General Assembly ratified H.B. 1092, which proposed an amendment to the North Carolina Constitution requiring voters to produce an ID as a condition for being allowed to vote. The amendment appeared on the November 2018 general election ballot, and it was approved by a majority of the voters. The trial court outlined six examples evidencing H.B. 1092's departure from normal procedures: (1) H.B. 1092 was immediately ratified following the Supreme Court's decision in *Covington*, 138 S. Ct. 2548 (2018); (2) H.B. 1092 was enacted during a short session of the General Assembly; (3) H.B. 1092 was passed along with an atypically large number of other proposed constitutional amendments; (4) H.B. 1092 was not accompanied by proposed legislation which would be necessary to implement its provisions if adopted by the voters; (5) the ballot question that presented H.B. 1092 did not explain to voters that the General Assembly would need to enact additional laws to implement the amendment; and (6) North Carolina voters had less time than usual to consider the constitutional amendment before voting on it.

¶ 45 Data available following the United States Supreme Court's decision in *Covington* showed that eliminating the racially gerrymandered districts identified in that litigation would likely result in fewer Republican districts and increase the chance for Democrats to gain General Assembly seats. The Court entered its decision

in *Covington* on 28 June 2018, and the following day, the North Carolina General Assembly enacted H.B. 1092. The trial court reasoned that passing H.B. 1092 the day after the Supreme Court's decision in *Covington*, evidenced an effort and intent by Republicans in the General Assembly to preserve a Republican supermajority that had been elected in part by voters in racially gerrymandered districts.

¶ 46        Furthermore, the fact that H.B. 1092 was enacted in a short session, and on a shorter timeline than other bills proposing constitutional amendments, was significant to the trial court. Notably, between 1971 and 2018, forty-two of forty-five proposed constitutional amendments were adopted during a long session. The trial court also considered testimony by Representative Mary Price Harrison who has served in the General Assembly and on the House Election Law and Campaign Finance Reform Committee since 2005. Representative Harrison testified that, based on her experience and the significance of H.B. 1092, the process for consideration of this amendment had been "fairly rushed." Thus, the trial court concluded that consideration of this proposal during the short session and the short timeline between the legislature's passage of the measure and its appearance on the general election ballot constituted a departure from normal procedure.

¶ 47        H.B. 1092 was also one of six constitutional amendments passed by the General Assembly during the short session. Enacting such a high number of proposed constitutional amendments in a single year is atypical for the General Assembly.

Moreover, as previously noted, H.B. 1092 was not accompanied by proposed implementing legislation. In the past, proposed constitutional amendments and any legislation necessary to implement an amendment's subject matter, were passed in the same session and sometimes in the same bill. Yet the failure to follow normal procedures or pass implementing legislation did not result from a lack of means to do so by the General Assembly. Indeed, the trial court found that the General Assembly could have considered implementing legislation either during the short session while considering H.B. 1092 or during one of the separate extra sessions convened that year to address election topics. Had the process moved at a more typical pace, implementing legislation also could have been considered by the standing bipartisan Joint Election Oversight Committee; however, that group did not meet between the end of the short session and the November 2018 election.

¶ 48       The trial court also found it significant that the ballot question presenting the constitutional amendment did not inform voters that it would be necessary for the General Assembly to enact separate laws to implement the amendment. Yet, before 2018, if an amendment required implementing legislation, that matter was explained on the ballot via the ballot question. But because H.B. 1092 deviated from normal procedure, voters were left with incomplete information, namely, what types of IDs would be acceptable if the amendment passed, or what, if any, additional laws would need to be implemented in furtherance of the amendment.

¶ 49        Moreover, the trial court found that North Carolina voters had less time than usual to consider the constitutional amendment. This calculation was based on the average amount of time between the enactment of a law proposing a constitutional amendment and the date on which voters would decide on the referendum. Here, while the average length of time voters have to decide on a referendum is 337 days, in this case North Carolina voters only had 130 days to consider H.B. 1092.

¶ 50        The trial court also found it significant that the General Assembly's Republican supermajority chose to enact S.B. 824 during a lame duck session over Governor Cooper's veto. This process was unprecedented and was found to violate the General Assembly's norms and procedures in several ways. It is important to note that in the same election in which voters approved the constitutional amendment requiring voter ID (H.B. 1092), Republicans lost ten of the seventy-five seats they had held in the North Carolina House of Representatives and six of the thirty-five seats they previously held in the North Carolina Senate. This meant that as of 1 January 2019, Republicans would no longer enjoy a three-fifths supermajority in either the North Carolina House of Representatives or the North Carolina Senate.

¶ 51        The trial court found that no other legislation implementing a constitutional amendment had ever been enacted in a post-election lame duck session, and the lame duck session in which the General Assembly passed S.B. 824 was the only reconvened regular session in North Carolina history to be held following a November general

election, conducted so shortly before newly elected officials took office two months later. This scenario occurred despite there being no need for the General Assembly to reconvene for that purpose before January of the following year. Indeed, in the same 2018 November general election, voters also approved another constitutional amendment (Marsy's Law) which also required implementing legislation; however, the General Assembly did not pass implementing legislation for this new amendment until August 2019, well after the new legislature had been seated. Taking all this information together, the trial court found that the evidence suggested that Republicans wanted to entrench themselves by passing a more restrictive version of the voter ID law and that convening the lame duck session was consistent with the hypothesis that the Republican supermajority did not want to pass a " 'watered down' voter ID law–*i.e.*, a law that would have been more flexible and included more forms of qualifying ID if it had been passed once the incoming 2019 legislature was seated."

¶ 52        Importantly, legislative defendants admitted their actions were designed to keep newly elected legislators from voting on the implementing legislation to the constitutional amendment. While legislative defendants saw these actions as a valid use of Republicans' supermajority power, the trial court reasoned instead that these events evidenced an attempt to use authority improperly gained through the use of racially gerrymandered districts that had been invalidated in *Covington*. And, according to the court, without the benefit of the racially gerrymandered districts,

legislative defendants would not have had a supermajority and no voter ID bill would have been offered or passed.

¶ 53　　In the face of this overwhelming evidence, legislative and state defendants maintain that the sequence of events surrounding the passage of S.B. 824 does not show discriminatory intent. State defendants contend that, although under *McCrory* a legislature does "not need to break its own rules to engage in unusual procedures," there must be evidence that creates an "inference that is strong enough to overcome the presumption of legislative good faith." To support this assertion that the evidence here was not sufficient, defendants provide examples of different circumstances from both *Veasey* and *McCrory*. In *Veasey* the Fifth Circuit found that, *inter alia*, suspension of the two-thirds rule regarding the number of votes required to accelerate the challenged bill's consideration and the absence of a fiscal note for that same measure were sufficient to show a drastic and unprecedented deviation from the usual process for adopting legislation. *Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) (en banc), rev'd in part, 888 F.3d 192 (5th Cir. 2018). While the facts in *Veasey* show how the Texas legislature failed to follow its normal procedures, that is not the only way to demonstrate a deviation. The *Arlington Heights* analysis relies on the facts of a particular case, including the procedures of the body that passed the challenged law. *Arlington Heights*, 429 U.S. at 269–70 (analyzing the sequence of events leading to the Village's denial of a re-zoning request). In *Abbott v. Perez*, the

United States Supreme Court emphasized this point, stating that "[t]he ultimate question remains whether a discriminatory intent has been proved in a given case." 138 S. Ct. at 2324–25 (cleaned up). Thus, the facts in *Veasey* are interesting but not determinative of whether the North Carolina legislature deviated from its normal procedures in passing S.B. 824.

¶ 54        Defendants also note that in *McCrory*, the Fourth Circuit characterized the sequence of events leading to the passage of H.B. 589 as a "suspicious narrative," *McCrory*, 831 F.3d at 228, because before the enactment of H.B. 589, a much more modest voter ID bill went untouched for months until the Supreme Court's decision in *Shelby County*. Defendants offer the facts in *McCrory* as an example of a case that supports an inference of discriminatory intent by the legislature, namely, that before its enactment the original, more modest bill grew from sixteen to fifty-seven pages, that the bill was "rushed" through the legislature and ratified in three days, and that the vote proceeded on strict party lines. *See McCrory*, 831 F. 3d at 227–28. The facts in *McCrory* are only relevant in this case to the extent they provide evidence of the historical context of S.B. 824, or to the extent they are part of the events that led up to S.B. 824's passage. *See Arlington Heights,* 429 U.S. at 267. To the extent defendants intend to show that the specific sequence of events leading up to the passage of H.B. 589 is the only way a trial court can find evidence of discriminatory intent, this argument is misguided. Under *Arlington Heights*, an analysis of

discriminatory intent requires a review of the actions taken in this particular case. 429 U.S. at 269–70. Thus, the trial court was correct in conducting a factual inquiry detailing the events leading up to the enactment of S.B. 824, based on the findings of fact the court made in this particular case.

¶ 55        Legislative defendants argue that there are no North Carolina cases that identically match the facts of this case and thus, not considering the relevant cases from other states is the equivalent of "turning a blind eye" to situations that might be informative. But this assertion cannot be true in light of the question to be answered and the analysis required by *Arlington Heights*. Here the question is whether the North Carolina legislature passed S.B. 824 with discriminatory intent. Thus, it follows, and *Arlington Heights* confirms, that what is relevant are the facts surrounding S.B. 824's passage. What occurred in Texas, South Carolina, or Virginia, in the course of passing other voter ID laws cannot be relevant to our inquiry.

¶ 56        Legislative defendants also advance another similar argument regarding the General Assembly's decision to convene a post-election lame duck session. Specifically, defendants state that a lame duck session cannot justify suspicion under an *Arlington Heights* analysis because these sessions are frequently used by "several state legislatures . . . and in the United States Congress." But as we have explained above, this information cannot be relevant to an *Arlington Heights* analysis, which requires an analysis of the specific conduct taken by the decision-making body that

passed the challenged law. 429 U.S. at 269–70. Thus, what matters in this case is the trial court's findings of fact, based on expert testimony, which established that convening a lame duck legislative session to enact a law implementing a constitutional amendment was unprecedented in North Carolina.

¶ 57        Taking all this information together, we conclude that the trial court's findings of fact are supported by competent evidence and its application of *Arlington Heights* to the sequence of events leading to S.B. 824's enactment was correct. Accordingly, we hold that the sequence of events leading up to S.B. 824's passage supports the determination that S.B. 824 was enacted with the discriminatory intent to target African-American voters.

**D. Legislative History of S.B. 824**

¶ 58        The legislative history of a decision to enact a particular proposal may be "highly relevant" in determining whether discriminatory intent was present in the challenged decision. *Arlington Heights*, 429 U.S. at 268. The trial court concluded that the legislative history of S.B. 824 indicated that the General Assembly intended to target African-Americans voters in order to entrench the Republican majority. To reach this conclusion, the trial court analyzed four actions: (1) the rushed passage of the law; (2) the fact that proposed amendments that could have benefited African-American voters were rejected; (3) the fact that S.B. 824 as written did not show an attempt to cure the racial disparities embodied in H.B. 589; and (4) that there was

little involvement by Democratic lawmakers in S.B. 824's consideration and enactment.

¶ 59 First, the trial court reviewed S.B. 824's hasty enactment. There the court found that the law had been passed in eight legislative days and a pre-filed draft was circulated by its sponsors on 20 November 2018, the Tuesday before Thanksgiving, when many legislators were preparing for the holiday with their families. Furthermore, S.B. 824 was filed, introduced, referred to committee, and considered by the committee all on the same day. This chain of events is highly atypical, and generally during a regular session, committee consideration would take weeks, not hours or days. Specifically, S.B. 824 was introduced in the Senate on 27 November 2018, the Tuesday following Thanksgiving, and then the bill was referred to the Select Committee on Elections, which gave the bill a favorable report. From there the bill was re-referred to the Committee on Rules and Operations of the Senate the very same day. The next day, 28 November 2018, the Rules Committee met and gave the bill a favorable report, and the bill was placed on the Senate Calendar for that same day. The bill then passed its second reading and was placed on the Senate Calendar for the next day, where it quickly passed the Senate on its third and final reading. Only a handful of amendments were adopted, while others were offered but immediately tabled. In total, the Senate considered S.B. 824 for a maximum of two and a half days.

¶ 60        On 29 November 2018, the same day the bill passed its final vote in the Senate, the House received S.B. 824 and the measure was immediately referred to the Committee on Elections and Ethics Law. The committee met on 3 and 4 December 2018, and after hearing public comment from only five North Carolinians, approved the bill and referred it to the full House for a vote. A "handful" of amendments were adopted in the House, and the amended bill was subsequently sent to the Senate for concurrence. The Senate concurred with the House version of the bill on 6 December 2018. While the bill was in the Senate, both during the initial debate and when it returned for concurrence, Democrats tried twice to table the bill. If approved, this would have allowed additional time for input and discussion from voters and lawmakers; however, these efforts were unsuccessful.

¶ 61        Furthermore, because the entire process was rushed, two senators, Senator Robinson and former Senator McKissick, testified they were unable to research to determine whether any ameliorative amendments could be crafted. Also, typically in the House following an objection, the debate on the subject bill would continue into the next day; however, in this case that did not occur. When, in accord with a procedure typically available to legislators in the normal course of business, Representative Harrison objected to the third reading so that additional amendments could be considered, despite her belief that the objection was properly lodged, her objection was denied. It is important to note that this rushed process prevented

adequate consideration of concerns raised by legislators, namely, that S.B. 824 would disproportionately burden African-American voters, the same way that H.B. 589 had done.

¶ 62      For example, Senator Van Duyn cited an analysis showing that at least 5.9% of registered North Carolina voters lacked identification acceptable under H.B. 589, and that 9.6% of African-American registered voters lacked acceptable IDs, compared with 4.5% of white registered voters. Accordingly, Senator Van Duyn not only expressed concerns about the risk of disenfranchisement of several hundred thousand of registered voters but also regarding the General Assembly's hurried efforts to pass S.B. 824. Thus, Senator Van Duyn noted she could not support the bill at that time. Moreover, Senator Erica Smith, who represents a district mostly composed of African-Americans, argued on the Senate floor that the bill was going to discriminate against and disenfranchise the voters in her area and across the state. Yet, despite having information indicating that S.B. 824 could bear more heavily on African American voters just as H.B. 589 had done, legislators made no changes to the bill.

¶ 63      While the General Assembly knew S.B. 824 could bear more heavily on African American voters, the trial court found that lawmakers did little if anything to address these concerns when raised by other General Assembly members. Even though members knew these concerns existed, the legislature did not request any additional data regarding ID possession rates that could further inform legislators regarding

the effect S.B. 824 would have on African-American voters and other voters of color. But in 2013, before the passage of H.B. 589, data compiled by the State Board of Elections, and made available to the General Assembly showed that 176,091 Democratic voters could not be matched with a North Carolina DMV-issued ID, compared to 67,639 Republican voters. Of the Democratic voters who lacked a DMV-issued ID, 67,553 were white and 91,927 were African American. Of the Republican voters who lacked a DMV-issued ID, 2,549 were African-American and 60,592 were white. Of the racial groups measured in 2013, the trial court found that African-American voters constituted the largest proportion of voters without a DMV-issued ID.

¶ 64    Governor Roy Cooper vetoed S.B. 824 because he believed it "was designed to suppress the rights of minority, poor, and elderly voters." But the Senate overrode the veto in a 32 to 12 vote. The House likewise overrode the veto with a 72 to 40 vote. Of the legislators who voted for H.B. 589 on concurrence in 2013, sixty-two of them voted to override the Governor's veto of S.B. 824. The trial court found that this group represented a "fairly significant overlap of members who were there for the 2013 and 2018 votes." Taking all this information together, the trial court found that the Republican supermajority pushed S.B. 824 "with limited analysis and scrutiny" in order to enact a more restrictive voter ID bill before losing their supermajority status the following January.

¶ 65 Second, the trial court found that proposed amendments that would have benefited African-American voters were rejected. Specifically, in the Senate, five such amendments were tabled. These proposed amendments were designed to educate and inform voters and expand opportunities for African-American community members to go to the polls and vote. Although it is true that some of the amendments suggested by Democrats were accepted, the trial court found that those amendments were primarily "technical" in nature and "were not as consequential" as the tabled amendments. Furthermore, amendments to S.B. 824 were considered on only one day in the Senate, on 28 November 2018. This meant that Senate Democrats had no time to conduct research regarding the implications of any proposed amendments to S.B. 824, to consider any ameliorative effects the amendments might have, or to request demographic data about voter ID possession disaggregated by race. This rushed timetable also made it difficult for Democratic Senate members to research what types of ameliorative amendments to voter ID laws in other jurisdictions could help increase African American voter participation in North Carolina under S.B. 824. For example, former Senator McKissick testified that, had he known that on Election Day, South Carolina's voter ID law provides free photo IDs that do not have an expiration date, he would have offered amendments adding these provisions to S.B. 824.

¶ 66 In the House, Democrats proposed a series of ameliorative amendments

including the addition of public assistance IDs to the list of qualifying IDs and a requirement that early voting sites be open on the last Saturday before the election. The amendment to add public assistance IDs was rejected after Representative Lewis asserted that there would be no way to impose North Carolina standards on the federal government. Yet the federal government also controls federal military IDs, and those IDs were among the acceptable forms of ID originally listed in S.B. 824. Following the Fourth Circuit's logic in *McCrory*, the trial court found the legislature's rejection of public assistance IDs "particularly telling." During the H.B. 589 litigation, the district court specifically found that the removal of public assistance IDs was "'suspect' because a reasonable legislator [would be] aware of the socioeconomic disparities endured by African Americans [and] could have surmised African Americans would be more likely to possess this form of ID." *McCrory*, 831 F.3d at 227–28. Although the General Assembly subsequently decided to add public assistance IDs as a qualifying voter ID via H.B. 1169, this action does not change the legislature's intent in enacting S.B. 824. Furthermore, the Saturday early voting amendment was ruled out of order, and thus it was not voted on at all. Because the Fourth Circuit in *McCrory* had found, during the H.B. 589 litigation, that a reduction in early voting days bore more heavily on African-American voters in North Carolina, the trial court found the denial of this amendment to be suspicious as well. *Id.* at 231–32.

¶ 67        Third, the trial court found that S.B. 824 did not demonstrate an intent by the General Assembly to cure the racial disparities observed under H.B. 589. Although S.B 824 included additional forms of qualifying IDs not allowed in H.B. 589, because the legislature did not request data on ID possession rates disaggregated by race, lawmakers could not know what, if any, impact the addition of these IDs would have on the racial disparities observed under H.B. 589. In the eyes of the trial court, without evidence that these additional forms of ID would overcome the existing deficiency, their addition was arbitrary. This was especially evident in the varying issuance criteria and expiration requirements tied to each acceptable form of ID. For example, S.B. 824 accepted federal worker IDs but not public assistance IDs. Also, while military IDs, were accepted with no expiration date, free NC Voter IDs had a one-year expiration date. Under S.B. 824, driver's licenses were to be accepted for up to a year after their expiration date, but revoked IDs had an entirely different timeline; the trial court found this distinction inconsistent because there is no difference in the verification quality of either ID. The court found that all these examples demonstrated "the lack of reasoning or logic in the legislature's designation of acceptable form of IDs."

¶ 68        At trial Professor Callanan testified in support of the legislative defendants opining that S.B. 824's list of acceptable IDs did not suggest an intent to favor forms of IDs held disproportionately by white voters. At the same time, Professor Callanan

offered no information concerning what the General Assembly believed or knew about racial disparities when it made the decision to include some forms of ID and not others. Professor Callanan also admitted he was unaware of any evidence suggesting the General Assembly had looked at the experience of other states when determining which forms of ID would be acceptable under S.B. 824. Taken together, this testimony supported plaintiffs' assertion that the General Assembly had not considered any updated race-based data before enacting S.B. 824.

¶ 69    The trial court also expressed concerns regarding S.B. 824's "reasonable impediment" provision, finding that this provision did not show an intent by the legislature to reduce the burden on voters without a qualifying ID. This conclusion was based on testimony which showed that despite H.B. 589's reasonable impediment declaration, voters were at risk for disenfranchisement, and many were excluded from political participation. Specifically, over fifteen percent of those who voted via a reasonable impediment provisional ballot had their votes rejected. Importantly, the trial court found the reasonable impediment provision does not protect all voters who lack a qualifying ID. This shortcoming was evidenced during the March 2016 primary in which 1,248 voters without acceptable photo IDs cast provisional ballots but did not execute a reasonable impediment declaration or otherwise cure their provisional ballots. Thus, these votes were not counted despite there being no finding of voter fraud or ineligibility to vote.

¶ 70        Fourth, the trial court found S.B. 824's enactment was not a bipartisan effort and that the limited Democratic involvement present in S.B. 824's enactment did not serve to normalize the legislative process. This finding was supported by testimony from General Assembly members who noted the absence of the bipartisan discussion which had often been present in passing other bills. For example, Senator Robinson expressed that she did not consider the bill to be bipartisan because she was unable to meaningfully engage in discussion with her Republican colleagues or understand voters' concerns. Another General Assembly member, Representative Harrison, concluded that the bill was not a bipartisan effort because both parties did not work together to craft the legislation for the betterment of North Carolina.

¶ 71        Nonetheless defendants argue that S.B. 824's legislative history does not support an inference of discriminatory intent because passing the bill was a bipartisan effort. Defendants support this assertion by stating that "Senator Ford, an African American Democrat, was a primary sponsor of S.B. 824." But under cross-examination Senator Ford admitted that at the time he co-sponsored the legislation, he had not been caucusing with Democrats and instead was not only considering switching political parties, but felt like a "man without a party" and a "person without a political home." Senator Ford also testified that he had agreed to support S.B. 824 because he thought it would require election officials to provide free photo IDs at all early voting sites and at all polling places on Election Day. But as the trial court

explained, "Neither is true, thus it appears plausible that Senator Ford himself may not have supported S.B. 824" if he had known it did not contain those provisions.

¶ 72        State defendants also argue that the trial court's findings regarding a lack of bipartisan support ignored decisions from other courts in which less support from an opposing party was sufficient to demonstrate a lack of discriminatory intent. *See, e.g., Lee*, 843 F.3d at 603 ("While there was a substantial party split on the vote enacting the law, two non-Republicans (one Democrat and one Independent) voted for the measure as well"). Yet as noted above, under *Arlington Heights* what matters are the trial court's findings of fact regarding what is typical for the North Carolina General Assembly, not for any other state's legislature. *See Arlington Heights*, 429 U.S. at 269–270. Here, the trial court found the testimony by Representative Harrison and Senator Robinson to be significant. Moreover, the correct standard of review in this case establishes that a "trial court's findings of fact . . . are conclusive on appeal if there is competent evidence to support them," and this is true "even [if] the evidence could be viewed as supporting a different finding." *In re Estate of Skinner*, 370 N.C. at 139 (quoting *Bailey* 348 N.C. at 146). In this case, the trial court's findings of fact are supported by competent evidence: the testimony of General Assembly members who related that unlike the passage of other bills, S.B. 824's passage was not a true bipartisan effort.

¶ 73        State defendants also argue that S.B. 824's amendment process does not

support a finding of discriminatory intent. Specifically, they contend that out of the twenty-four amendments offered, thirteen were adopted before enactment. Although defendants argue that many of these amendments came from Democratic legislators who opposed the law, the trial court noted that while some of these amendments were adopted, they were technical in nature rather than substantive. This finding was also supported by competent evidence, namely, the testimony of Senator Robinson.

¶ 74 Legislative defendants further argue that the legislative history cannot support a finding of racially discriminatory intent because while passing S.B. 824, the legislature did not consider racial data like it had done when passing H.B. 589. But as found by the trial court the issue was not that race-based data were not considered. Instead, the issue was that because the General Assembly was on notice that a similar voter ID law, H.B. 589, had a disparate impact on African- American voters, the General Assembly's failure to request any data on how S.B. 824 might impact African-American voters was indicative of intent.

¶ 75 Based on the trial court's supported findings of fact and its analysis under *Arlington Heights*, we hold that S.B. 824's legislative history supports that S.B. 824 was passed with the discriminatory intent to target African American voters.

### IV.    Non-racial Motivations for Enactment of S.B. 824

¶ 76 "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to

demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). If discriminatory purpose is established, any deference previously accorded to the North Carolina General Assembly is no longer justified. *See Arlington Heights*, 429 U.S. at 265–66. To determine whether a law would have been enacted without a racially discriminatory motive, this Court must consider the "substantiality of the state's proffered non-racial interest and how well the law furthers that interest." *McCrory*, 831 F.3d at 233–34 (citing *Hunter*, 471 U.S. at 228–33).

¶ 77　　　　The trial court scrutinized the legislature's purported motivations for enacting S.B. 824 and concluded two things: (1) that the constitutional mandate imposed via the amendment could not justify the General Assembly's actions in passing S.B. 824, and (2) even if the General Assembly had an interest in preventing voter fraud, it would not have passed S.B. 824 "if it had no disproportionate impact on African American voters." (quoting *McCrory*, 831 F.3d at 235). The court reasoned that, although the amendment to the North Carolina Constitution required the General Assembly to pass a voter ID law, nothing in the amendment's text required passing a law that was disproportionately burdensome on African-American voters. The constitutional amendment also allowed for exceptions to the law, and even though the General Assembly had reason to know that African-American voters would be disproportionately affected by S.B. 824, it still chose to pass a law that required the

specific IDs African-American voters disproportionately lack.

¶ 78        Regarding the State's interest in preventing voter fraud, or promoting voter confidence in elections, the trial court followed the Fourth Circuit's precedent in *McCrory* which teaches that these non-racial motivations are not necessarily sufficient to justify passage of a voter ID law and that preventing voter fraud may not be a neutral justification for a voter ID law. *McCrory*, 831 F.3d at 235. At this stage, because it had been established that race played at least some role in the passage of S.B. 824, the proper judicial inquiry required ascertaining whether the law would have been passed if it did not have a disproportionate impact on African American voters. *Id*. In answering this question, the trial court found that in North Carolina, voter fraud is rare, with only two documented cases of in-person voter fraud between 2000 and 2012. From 2015 to 2019, the State Board of Elections only referred five cases of alleged voter impersonation fraud to prosecutors. In April 2017, the State Board of Elections released an audit of the prior year's general election which showed that "questionable ballots" were only 0.01% of the 4,469,640 total votes cast. Of the 508 cases of fraudulent voting identified, only one involved the type of in-person deception that might be prevented by a voter photo ID law. Thus, the trial court noted, there was little evidence that a voter ID law would prevent voter impersonation even if such fraudulent behavior was common. Taking this information together, the trial court concluded that "voter fraud in North Carolina is almost nonexistent."

¶ 79         Also, indicative of the General Assembly's intent was the fact that prior to the enactment of S.B. 824, the General Assembly did not request data on rates of voter fraud in North Carolina nor did it ask the State Board of Elections to analyze the potential effect S.B. 824 might have on voter fraud. Considering this situation as a whole, the trial court explained that lawmakers could have passed a less restrictive law that could have sufficiently addressed the small amount of potential voter fraud, without bearing as heavily on African American voters. In light of this information, the court ultimately concluded that defendants failed to show that S.B. 824 would have been passed if it had not produced a disproportionate impact on African-American voters. *McCrory*, 831 F.3d at 235.

¶ 80         Based on the evidence presented to the trial court and the court's careful analysis under the *Arlington Heights* factors, we hold that S.B. 824 was enacted with the discriminatory intent to target African-American voters who were unlikely to vote for Republican candidates. In doing so, we do not conclude that the General Assembly harbored racial animus; however, we conclude just as the trial court did, that in passing S.B. 824, the Republican majority "targeted voters who, based on race, were unlikely to vote for the majority party." *Id.* at 233. It is important to note that although our holding parallels the Fourth Circuit's holding in *McCrory*, our conclusion is not based on that holding or on our finding that H.B. 589 was also enacted with discriminatory intent. Instead, our holding is based on the specific

findings of fact made by the trial court which included the disparate impact of S.B. 824, the historical background of S.B. 824, the sequence of events leading up to S.B. 824's passage, and S.B. 824's legislative history.

¶ 81     Because we have concluded that discriminatory intent was a motivation in passing S.B. 824, judicial deference to the legislature is no longer warranted. *Arlington Heights*, 429 U.S. at 265–66. Based on the factual findings made by the trial court, we agree that S.B. 824 would not have been passed absent discriminatory intent. We also agree that this conclusion is supported by the almost nonexistent nature of voter fraud in North Carolina, as well as the fact that the General Assembly considered no data on the effect S.B. 824 would have on the General Assembly's purported goals.

¶ 82     Based on this information, we also find support for the trial court's finding that given the rarity of voter fraud in North Carolina, a less restrictive law could have been sufficient to deter voter fraud and promote voter confidence in elections had this goal been the law's only actual purpose. In addition to the trial court's findings, other states' laws are indicative of the General Assembly's ability to pass a less restrictive voter ID law that may not violate North Carolina's equal protection clause. States such as Louisiana and Mississippi have enacted less restrictive voter ID laws, which allow individuals to vote without identification as long as they sign an affidavit confirming their eligibility to vote. La. Stat. Ann. § 18:562 (2021) (Louisiana's

"Prerequisites to voting" law); Miss. Code. Ann. § 23-15-573 (West 2021) (Mississippi's "Voting by affidavit" law).

¶ 83        Furthermore, many of defendants' arguments in this case ask this Court to rewrite the trial court's findings of fact. But when the trial court conducts a trial without a jury, "the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even [if] the evidence could be viewed as supporting a different finding." *In re Estate of Skinner*, 370 N.C. at 139 (2017) (quoting *Bailey*, 348 N.C. at 146). Also, as noted above, defendants attempted to analogize the facts of their case to those in other cases in which voter ID laws were upheld. Although this is not the appropriate analysis under *Arlington Heights*, we do find it important that those specific voter ID laws were not passed in same manner as S.B. 824. *See e.g. Lee* 843 F.3d. at 603 (stating that "the legislative process here was normal, with full debate, and no evidence was presented of untoward external pressures or influences affecting the debate"); *South Carolina v. United States*, 898 F. Supp 2d at 44 (observing that "South Carolina legislators did not just plow ahead [with the bill] in the face of the data showing a racial gap.")

¶ 84        Accordingly, we affirm the trial court's final judgment and order and hold that S.B. 824 violates article I, section 19 of the North Carolina Constitution because the law was enacted with discriminatory intent to disproportionately disenfranchise and

burden African-American voters in North Carolina.

AFFIRMED.

Justice BERGER dissenting.

In November 2018, the people of North Carolina overwhelmingly amended their constitution to include a voter-ID requirement based upon a simple belief — that would-be voters should be required to identify themselves prior to casting a ballot. Enabling legislation in the form of S.B. 824 was passed to effectuate the requirements of that constitutional amendment. S.B. 824 contained various photo identification requirements, a provision to provide every voter with a free photo identification, and a host of exceptions which allow individuals to vote without an identification.

The Fourth Circuit addressed many of the issues presented in the present appeal when it reviewed S.B. 824 and concluded that the legislation was not passed with discriminatory intent. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 305 (4th Cir. 2020). In applying the same *Arlington Heights* factors the majority utilizes today, the court in *Raymond* determined that when the "proper burden and the presumption of good faith are applied, the [complainants] fail to meet their burden of showing that the General Assembly acted with discriminatory intent in passing the 2018 Voter-ID Law." *Id.*

The majority here, however, refuses to follow *Raymond*. Although the majority cites to this case briefly in its 58-page opinion, the majority has determined that it

will not follow *Raymond* because "there is no evidence the voters intended the law to be passed in its current form." *Supra* ¶ 39. The majority apparently overlooks the fact that the will of the people is carried out by the legislature. *See N.C. State Conf. of the NAACP v. Moore*, 382 N.C. 129, 2022-NCSC-99, ¶ 26 ("[i]n the system of government our constitution prescribes, the legislature represents the untrammeled will of the people" (cleaned up)).

¶ 88    The majority and the trial court make the same legal mistakes for which the federal district court's ruling was rebuked by the Fourth Circuit in *Raymond*: they misapply *Abbott v. Perez*, 138 S. Ct. 2305 (2018), fail to credit the legislature with the presumption of good faith, and place no burden on plaintiffs. The legislature was required to pass enabling legislation by virtue of the constitutional amendment authorized by the people. This important procedural event, which is discussed at length in *Raymond*, is all but dismissed by the majority in its analysis. Moreover, the majority affords no presumption of good faith, even though S.B. 824 is far less restrictive than what could have been passed under the plain language of the constitutional amendment.

¶ 89    The plain language of S.B. 824 shows no intent to discriminate against any group or individual, and there is no evidence that S.B. 824 was passed with race in mind, let alone a racially discriminatory intent. The majority relies, as it must, on a misapplication of relevant case law and on its own inferences to reach a contrary

result. As in *Raymond*, the lower court's final judgment and order should be reversed, and I respectfully dissent because "fundamental legal errors . . . permeate [the majority] opinion." *Raymond*, 981 F.3d at 310–11.

## I. Factual and Procedural Background

"All political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I, § 2. The people of this state exercised that inherent political power in November 2018 when they voted to amend our Constitution to include a voter ID requirement.[1] That amendment states in part: "[v]oters offering to vote in person shall present photographic identification before voting." N.C. Const. art. VI, § 2(4). It also states the "General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions." *Id*.

To comply with the requirements of article VI, section 2(4) of the North Carolina Constitution, the General Assembly passed North Carolina Session Law 2018-144, An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote (S.B. 824). S.B. 824 requires registered voters to present either a valid, unexpired: (1) North Carolina driver's license; (2) North

---

[1] *See generally N.C. State Conf. of the NAACP v. Moore*, 382 N.C. 129, 2022-NCSC-99 (Berger, J., dissenting).

Carolina nonoperator's ID; (3) United States passport; (4) North Carolina voter photo ID card; (5) tribal enrollment card issued by a State or federal recognized tribe; (6) student ID card issued by any statutorily-defined eligible institution; (7) employee ID card issued by a state or local government entity; or (8) out-of-state driver's license or nonoperator's ID if the voter's registration was within ninety days of the election. Or, regardless of expiry, voters may present a: (1) military ID issued by the United States government; (2) a veterans ID card issued by the United States Department of Veterans Affairs; or (3) any of the aforementioned IDs of a voter older than sixty-five, so long as the ID was unexpired at the time of the voter's sixty-fifth birthday. S.B. 824 § 1.2(a).

The new law further requires the State to provide a free voter ID if requested by a registered voter. S.B. 824 § 1.1(a). Voters need not submit any official documentation to receive these free IDs. *Id.* Instead, individuals seeking a free ID only need to provide their "name," "date of birth, and the last four digits of [their] social security number." *Id.*

In fact, despite the common misunderstanding of what the voter ID law entails, and despite the majority's mischaracterization of the law, S.B. 824 specifically states that "[a]ll registered voters will be allowed to vote with our without a photo ID card." S.B. 824 § 1.5(a). This is so because the law contains multiple exceptions to the photo ID requirements, including a religious objection exception and a reasonable

impediment exception. S.B. 824 § 1.2(a). The reasonable impediment exception allows voters to cast a provisional ballot without a photo ID, so long as they complete an affidavit at the voting location. S.B. 824 § 1.2(a).

¶ 94        After the enactment of S.B. 824, plaintiffs filed a suit facially challenging the law in Wake County Superior Court. Plaintiffs alleged, among other arguments, that S.B. 824 violates the equal protection clause of the North Carolina Constitution. *See* N.C. Const. art. I, § 19. Plaintiffs moved for a preliminary injunction, seeking to prevent the implementation of S.B. 824 until their claims were determined on the merits. Defendants answered and moved to dismiss, and the case was transferred to a three-judge panel on March 14, 2019. In July 2019 the panel dismissed all of plaintiffs' claims except the equal protection claim. A majority of the panel also denied plaintiffs' motion for a preliminary injunction, with one judge dissenting.

¶ 95        Plaintiffs appealed the denial of the preliminary injunction, and the Court of Appeals reversed the three-judge panel's decision on February 18, 2020. *Holmes v. Moore*, 270 N.C. App. 7, 36, 840 S.E.2d 244, 266–67 (2020). Accordingly, the trial court issued the preliminary injunction on August 10, 2020, and then held a trial on the merits of plaintiffs' equal protection claim. In September 2021, a majority of the three-judge panel ruled in plaintiffs' favor and held that S.B. 824 violated the equal protection clause of our constitution because it was enacted with discriminatory intent. The panel then permanently enjoined enforcement of the law. One judge on

the panel dissented, and defendants timely appealed to the Court of Appeals. However, before the matter could be considered by the Court of Appeals, plaintiffs petitioned this Court for expedited review prior to a determination by the Court of Appeals.[2]

¶ 96    On appeal, defendants argue that the panel erred in finding that S.B. 824 was enacted with discriminatory intent and erred in concluding that S.B. 824 violated the equal protection clause.

## II.    Analysis

### A. Introduction

¶ 97    It is well-settled that the proper exercise of our judicial power requires great deference to acts of the General Assembly, as the legislature's enactment of statutes is the sacrosanct fulfillment of the people's will.  "[P]ower remains with the people and is exercised through the General Assembly, which functions as the arm of the electorate.  An act of the people's elected representatives is thus an act of the people

---

[2] This Court granted expedited review even though the constitutional claim in *North Carolina State Conference of the NAACP v. Moore*, 382 N.C. 129, 2022-NCSC-99, had not been resolved and remand is still pending in the trial court. One might contend that this grant of expedited review was a concrete example of this Court, as Justice Earls stated in a recent interview, "wielding power based on our own political views." *'Ramifications are substantial.' How Republicans gained a lasting grip on the NC Supreme Court*, WRAL (Nov. 13, 2022), https://www.wral.com/ramifications-are-substantial-how-republicans-gained-a-lasting-grip-on-the-nc-supreme-court/20570554/. Indeed, many North Carolinians would agree with Justice Earls that this is "a whole different notion of justice" and that the outcome of this case was wholly "depend[ent] on what year [a party] brings [its] case" or when the majority decided to hear this matter.

and is presumed valid *unless it conflicts with the Constitution.*" *Pope v. Easley*, 354

N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam) (citing *McIntyre v. Clarkson*,

254 N.C. 510, 515, 119 S.E.2d 888, 891–92 (1961)). Thus,

> we presume that laws enacted by the General Assembly
> are constitutional, and we will not declare a law invalid
> unless we determine that it is unconstitutional beyond a
> reasonable doubt. It is the burden of the proponent of a
> finding of facial unconstitutionality to prove beyond a
> reasonable doubt that an act of the General Assembly is
> unconstitutional in every sense.

*State v. Strudwick*, 379 N.C. 94, 2021-NCSC-127, ¶ 12 (cleaned up).[3]

Although "the trial court's findings of fact 'are conclusive on appeal if supported

by competent evidence, even if the evidence is conflicting,'" *State v. Parisi*, 372 N.C.

639, 649, 831 S.E.2d 236, 243 (2019) (quoting *State v. Eason*, 336 N.C. 730, 745, 445

S.E.2d 917, 926 (1994)), this Court must review de novo the trial court's conclusion

that S.B. 824 violates our equal protection clause. *See State v. Romano*, 369 N.C. 678,

685, 800 S.E.2d 644, 649 (2017) ("Whether a statute is constitutional is a question of

law that this Court reviews de novo.").

---

[3] It is difficult to imagine how enabling legislation which is less restrictive than what is called for in the constitution could conflict with that same constitution. *Compare* N.C. Const. art. VI, § 2(4) ("Voters offering to vote in person shall present photographic identification before voting."), *with* S.B. 824 § 1.5(a) ("All registered voters will be allowed to vote with our without a photo ID card."). Although there have been no challenges to the constitutionality of S.B. 824 on the grounds that it conflicts with article VI, section 2(4), one could argue that the exceptions to the photo identification requirement potentially render the constitutional provision a nullity.

### B. Equal Protection and *McCrory*

¶ 99            "No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin."  N.C. Const. art. I, § 19.  "This Court's analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause." *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009).  "However, in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding upon this Court."  *Bulova Watch Co. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 474, 206 S.E.2d 141, 146 (1974).  Accordingly, it is this Court's duty here to review whether plaintiffs have proven beyond a reasonable doubt that S.B. 824 violates our Constitution, and in so doing, it is appropriate for this Court to consider federal precedent.

¶ 100            "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S. Ct. 555, 563 (1977).  "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State."  *Abbott*, 138 S. Ct. at 2324 (citing *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481, 117 S. Ct. 1491, 1499 (1997)).  To meet

this burden under the federal analytical framework, plaintiffs "must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor" in the enactment of the challenged legislation. *Hunter v. Underwood*, 471 U.S. 222, 225, 105 S. Ct. 1916, 1918 (1985) (quoting *Underwood v. Hunter*, 730 F.2d 614, 617 (11th Cir. 1984)).

¶ 101        In *Arlington Heights*, the Supreme Court of the United States established a non-exhaustive list of evidentiary sources plaintiffs may use to establish discriminatory intent. Whether the legislation " 'bears more heavily on one race than another' may provide an important starting point," *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564 (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S. Ct. 2040, 2049 (1976)), however, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact," *id*. at 264–65, 97 S. Ct. at 563. In addition to any possible disparate impact, courts should also consider "[t]he historical background of the decision," the "specific sequence of events leading up the challenged decision," and the challenged action's "legislative or administrative history." *Id*. at 267–68, 97 S. Ct. at 564–65.

¶ 102        The Fourth Circuit applied these factors to an act of our General Assembly in *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). As the panel below relied heavily, if not entirely, on *McCrory*, and as the majority today affirms this improper analytical reliance, it is necessary to review the

specifics of that case.

¶ 103        In *McCrory*, the plaintiffs challenged various voting provisions contained in a 2013 omnibus bill enacted by North Carolina's General Assembly, including a voter ID provision, alleging that the law had been enacted with discriminatory intent.  The 2013 omnibus law was enacted shortly after the Supreme Court of the United States "invalidated the preclearance coverage formula," a federal statutory mechanism that required North Carolina, and other states with histories of racially motivated voter suppression laws, to seek preclearance with the United States Department of Justice before enacting new voting laws.  *McCrory*, 831 F.3d at 216 (citing *Shelby County v. Holder*, 570 U.S. 529, 557, 133 S. Ct. 2612, 2631 (2013)).  At the conclusion of trial, the district court found that the 2013 omnibus law was not enacted with discriminatory intent and entered judgment against the plaintiffs on all of their claims.  *Id.* at 219.

¶ 104        On appeal, the Fourth Circuit noted that the "ultimate question" was whether "the legislature enact[ed] a law 'because of,' and not 'in spite of,' its discriminatory effect."  *Id.* at 220.  In concluding that the 2013 omnibus law was enacted because of its discriminatory effect, i.e., with discriminatory intent, the Fourth Circuit determined that the "undisputed" facts regarding the "sequence of events leading up to the challenged decision" were "devastating."  *Id.* at 227 (quoting *Arlington Heights*, 429 U.S. at 267, 97 S. Ct. 555).  The court noted that:

[T]he district court found, prior to enactment of SL 2013-381, the legislature requested and received racial data as to usage of the practices changed by the proposed law.

This data showed that African Americans disproportionately lacked the most common kind of photo ID, those issued by the Department of Motor Vehicles (DMV). The pre-*Shelby County* version of SL 2013-381 provided that all government-issued IDs, even many that had been expired, would satisfy the requirement as an alternative to DMV-issued photo IDs. After *Shelby County*, with race data in hand, the legislature amended the bill to exclude many of the alternative photo IDs used by African Americans.

The district court found that, prior to enactment of SL 2013-381, legislators also requested data as to the racial breakdown of early voting usage. . . .

The racial data provided to the legislators revealed that African Americans disproportionately used early voting in both 2008 and 2012. In particular, African Americans disproportionately used the first seven days of early voting. After receipt of this racial data, the General Assembly amended the bill to eliminate the first week of early voting, shortening the total early voting period from seventeen to ten days. As a result, SL 2013-381 also eliminated one of two "souls-to-the-polls" Sundays in which African American churches provided transportation to voters.

The district court found that legislators similarly requested data as to the racial makeup of same-day registrants. . . .

The legislature's racial data demonstrated that, as the district court found, it is indisputable that African American voters disproportionately used same-day registration when it was available. . . . [I]n-person assistance likely would disproportionately benefit African Americans. SL 2013-381 eliminated same-day registration.

> Legislators additionally requested a racial breakdown of provisional voting, including out-of-precinct voting. . . .
>
> The district court found that the racial data revealed that African Americans disproportionately voted provisionally. . . . With SL 2013-381, the General Assembly altogether eliminated out-of-precinct voting.
>
> African Americans also disproportionately used preregistration. . . . SL 2013-381 eliminated it.

*Id*. at 216–18 (cleaned up).

"In sum, relying on this racial data, the General Assembly enacted legislation restricting all—and only—practices disproportionately used by African Americans." *Id*. at 230. The Fourth Circuit determined that "[t]he district court erred in refusing to draw the obvious inference that this sequence of events signals discriminatory intent." *Id*. at 227. Accordingly, the Fourth Circuit concluded that, "at least in part, discriminatory racial intent motivated the enactment of" the 2013 omnibus law. *Id*. at 233. Because the plaintiffs carried their burden of establishing discriminatory intent, and because the State had failed to show that the challenged provisions would have been enacted without discriminatory intent, the court reversed the district court's judgment and remanded the case "for entry of an order enjoining the implementation" of the challenged voting provisions of the 2013 omnibus law. *Id*. at 242.

## C. The Presumption of Good Faith

Two years after the Fourth Circuit's decision in *McCrory*, the Supreme Court

of the United States provided clarification to the discriminatory intent analysis that is especially relevant here. In *Abbott*, 138 S. Ct. 2305, the Court emphasized that "the 'good faith of [the] legislature must be presumed' " regardless of a prior finding of discriminatory intent. 138 S. Ct. at 2324 (alteration in original) (quoting *Miller v. Johnson*, 515 U.S. 900, 915, 115 S. Ct. 2475, 2488 (1995)).

¶ 107      In addition to carrying the burden of proving that a legislature acted with discriminatory intent, plaintiffs challenging state legislation as violative of the equal protection clause must also overcome "the presumption of legislative good faith." *Id.* "[T]his judicial deference is no longer justified" only if such plaintiffs "pro[ve] that a discriminatory purpose has been a motivating factor" in the legislation's enactment. *Arlington Heights*, 429 U.S. at 265–66, 97 S. Ct. at 563. If, and only if, plaintiffs overcome this presumption and prove by a preponderance of the evidence that discriminatory intent was a motivating factor will "the burden shift[ ] to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228, 105 S. Ct. at 1920.

¶ 108      In *Abbott*, the Court reversed the decision of a three-judge panel of the Western District of Texas because that panel imputed past discriminatory intent to the then-sitting legislature and thereby failed to presume good faith.

> The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. Past discrimination cannot, in the manner of original sin, condemn governmental

action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. The historical background of a legislative enactment is one evidentiary source relevant to the question of intent. But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Abbott*, 138 S. Ct. at 2324–25 (cleaned up).

¶ 109    The Court noted that the three-judge panel "referred repeatedly to the 2013 Legislature's duty to expiate its predecessor's bad intent" and concluded that the "Texas court's references to the need to 'cure' the earlier Legislature's 'taint' cannot be dismissed as stray comments." *Id.* at 2325. Although the Court stated that "a district court's finding of fact on the question of discriminatory intent is reviewed for clear error," it nonetheless reversed the panel because "when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." *Id.* at 2326.

**D. Federal Application of the Presumption to S.B. 824**

¶ 110    As is especially relevant here, though almost completely ignored by the majority, *Abbott*'s guidance on the presumption of good faith and a challenger's burden has already been applied to S.B. 824, the very law challenged in this case. In *Raymond*, 981 F.3d 295, the Fourth Circuit reviewed a decision of the United States District Court for the Middle District of North Carolina granting the plaintiffs' motion for a preliminary injunction enjoining enforcement of S.B. 824. The plaintiffs challenged S.B. 824 under the federal Equal Protection Clause, alleging that the law

had been enacted with discriminatory intent. *Id.* at 301. The plaintiffs moved for a preliminary injunction of the law, and the district court granted the injunction after concluding that the plaintiffs "were likely to succeed on their constitutional claims." *Id.*

¶ 111 The Fourth Circuit sharply rebuked the district court and reversed "because of the fundamental legal errors that permeate the [district court's] opinion." *Id.* at 310–11. Principal among these fundamental errors was that the district court "considered the General Assembly's discriminatory intent in passing the 2013 Omnibus Law to be effectively dispositive of its intent in passing the 2018 Voter-ID Law." *Id.* at 303. The court stated:

> The district court here made the same mistake as the panel in *Abbott* without even trying to distinguish the Supreme Court's holding. . . . [T]he district court noted that the General Assembly did not "try[ ] to cleanse the discriminatory taint," or "tak[e] steps to purge the taint of discriminatory intent." . . .
>
> The district court penalized the General Assembly because of who they were, instead of what they did. When discussing the sequence of events leading up to the 2018 Voter-ID Law's enactment, the district court discounted the normalcy of the legislative process to focus on *who* drafted and passed the law.

*Id.* at 304 (first quoting *N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15, 43 (M.D.N.C. 2019), then quoting *id.* at 35).

¶ 112 The Fourth Circuit explicitly disavowed the district court's inappropriate focus

on *who* passed S.B. 824:

> The question of *who* reared its head again in the
> court's discussion of the 2018 Voter-ID Law's legislative
> history. In that section, the district court emphasized that
> the General Assembly's positions had "remained virtually
> unchanged" between *McCrory* and the enactment of the
> 2018 Voter-ID law. And the court assumed that the racial
> data remained in the minds of the legislators: "[T]hey need
> not have had racial data in hand to still have it in mind."
> By focusing on *who* passed the 2018 Voter-ID Law and
> requiring the General Assembly to purge the taint of the
> prior law, the district court flipped the burden and
> disregarded *Abbott*'s presumption.

*Id*. at 304–05 (alteration in original) (quoting *Cooper*, 430 F. Supp. 3d at 33–35).

¶ 113 The district court's analytical reliance on *who* passed S.B. 824 "also overlooked

the state constitutional amendment" that "required the enactment of a voter-ID law

and designated to the General Assembly the task of enacting the law." *Id*. at 305

(citing N.C. Const. art. VI, § 2(4)). Because the amendment "served as an

independent intervening event between the General Assembly's passage of the 2013

Omnibus Law and its enactment of the 2018 Voter-ID Law," article VI, section 2(4)

of our Constitution "undercut[ ] the district court's tenuous 'who' argument." *Id*.

¶ 114 The Fourth Circuit determined that "[o]nce the proper burden and the

presumption of good faith are applied, the Challengers fail to meet their burden of

showing that the General Assembly acted with discriminatory intent in passing the

2018 Voter-ID Law." *Id*. In reaching this conclusion, the court clarified that although

"North Carolina's historical background," including the 2013 omnibus law, "favors

finding discriminatory intent, the facts considered under the remaining *Arlington Heights* factors—the sequence of events leading to enactment, legislative history, and disparate impact—cannot support finding discriminatory intent." *Id.* (cleaned up).

¶ 115    First, the court analyzed "the sequence of events leading to the enactment of the 2018 Voter-ID Law." *Id.* Noting that S.B. 824 "underwent five days of legislative debate," "was permitted time for public comment," and "enjoyed bipartisan support," the court determined that "the enactment was not the 'abrupt' or 'hurried' process that characterized the passage of the 2013 Omnibus Law." *Id.* at 305–06 (citing *McCrory*, 831 F.3d at 228–29).

¶ 116    Next, the court analyzed "the 2018 Voter-ID Law's legislative history," which the district court found "supported finding discriminatory intent" because "Republican legislative leaders strongly opposed *McCrory*, remained committed to passing a voter-ID law that would withstand future court challenges, and did not change their positions, goals, or motivations between the passage of the 2013 Omnibus Law and the 2018 Voter-ID Law." *Id.* at 307. The Fourth Circuit repudiated the district court's reasoning because its findings "impermissibly stemmed from the comments of a few individual legislators and relied too heavily on comments made by the bill's opponents." *Id.* (cleaned up). The court also stated that the district court's reasoning "go[es] against inferring 'good faith' on the part of the legislature, which we are required to do: decrying a court opinion holding that you

acted improperly in the past is not evidence that you have acted improperly again."
*Id*. Noting that "[n]othing here suggests that the General Assembly used racial
voting data to disproportionately target minority voters 'with surgical precision,'" the
court concluded that S.B. 824's legislative history did not suggest discriminatory
intent. *Id*. at 308–09.

¶ 117     Finally, the Fourth Circuit analyzed "the racial impact of the 2018 Voter-ID
Law." *Id*. at 309. While the court "accept[ed] the district court's finding that minority
voters disproportionately lack the types of ID required" by S.B. 824, it found
significant that the law "contains three provisions that go 'out of [their] way to make
its impact as burden-free as possible.'" *Id*. (second alteration in original) (quoting
*Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016)).

> First, the law provides for registered voters to receive free
> voter-ID cards without the need for corroborating
> documentation. Second, registered voters who arrive to the
> polls without a qualifying ID may fill out a provisional
> ballot and their votes will be counted if they later produce
> a qualifying ID at the county elections board. Third, people
> with religious objections, survivors of recent natural
> disasters, and those with reasonable impediments may
> cast a provisional ballot after completing an affidavit that
> affirms their identity and their reason for not producing an
> ID. Their votes must be counted unless the county board of
> elections has grounds to believe the affidavit is false.

*Id*. (cleaned up).

¶ 118     The Fourth Circuit noted that, because of these various mitigating provisions,
"the 2018 Voter-ID law is more protective of the right to vote than other states' voter-

ID laws that courts have approved." *Id.* at 310.

> In *Lee v. Virginia State Board of Elections*, we upheld Virginia's voter-ID law that only included two of these mitigating features—free voter IDs available without corroborating documentation and provisional voting subjected to 'cure.' Likewise, in *South Carolina v. United States*, the District Court of the District of Columbia precleared South Carolina's voter-ID law that included a different combination of two mitigating features—free voter IDs available without corroborating documentation and a reasonable impediment procedure. And recently, the Eleventh Circuit, in *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*, upheld Alabama's Voter-ID law that included . . . mitigating features—free voter IDs that require corroborating documentation and provisional voting subject to 'cure.' Given these cases, it is hard to say that the 2018 Voter-ID Law does not sufficiently go out of its way to make its impact as burden-free as possible.

*Id.* (cleaned up).

¶ 119    Because of these mitigating provisions, the court determined that any disparate impact of S.B. 824 did not evidence any discriminatory intent by the General Assembly.  The Fourth Circuit reversed the district court, but not because "[the district court] weighed the evidence before it differently than [the Fourth Circuit] would."  *Id.*  Rather, the court reversed the district court's grant of a preliminary injunction "because of the fundamental legal errors that permeate the opinion—the flipping of the burden of proof and the failure to provide the presumption of legislative good faith—that irrevocably affected its outcome."  *Id.* at 310–11.  The district court "abused its discretion" because "it considered the North

Carolina General Assembly's past conduct to bear so heavily on its later acts that it was virtually impossible for it to pass a voter-ID law that meets constitutional muster." *Id.* at 311.

**E. The Decision Below and the Majority Opinion**

¶ 120          With the relevant history and legal framework established, the errors in the panel's decision below become evident. A majority of the three-judge panel found "the evidence at trial sufficient to show" that the enactment of S.B. 824 was motivated at least in part by discriminatory intent. The panel also found that the State "failed to prove . . . that S.B. 824 would have been enacted in its present form if it did not tend to discriminate against African American voters." Based on these findings, the panel held that S.B. 824 "was in enacted in violation of the North Carolina Constitution" and permanently enjoined its enforcement.

¶ 121          Defendants argue, in part, that the panel below erred because (1) S.B. 824 does not disparately impact African-American voters; (2) the sequence of events around the passage of S.B. 824 does not show discriminatory purpose; and (3) S.B. 824's legislative history does not support a finding of discriminatory intent.

¶ 122          The panel's decision should be reversed because of the "fundamental legal errors" that both "permeate the [trial court's] opinion" and render its determination constitutionally unsound. *Raymond*, 981 F.3d at 310–11. Rather than recognizing the legal errors committed by the lower court, the majority side-steps these issues in

order to affirm the trial court's factual findings, which are themselves unsupported by competent evidence. In doing so, they fail to abide by the directly on-point guidance of the Supreme Court of the United States that "when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." *Abbott*, 138 S. Ct. at 2326.

¶ 123    The panel below stated in its conclusions of law that: (1) "The Historical Background of Senate Bill 824 Strongly Supports an Inference of Discriminatory Intent"; (2) "The Sequence of Events Leading Up to the Enactment of S.B. 824 Gives Rise to a Strong Inference of Impermissible Intent"; (3) "The Legislative History Supports the Conclusion that Racial Discrimination Was a Motivating Factor in the Enactment of S.B. 824"; and (4) "The Impact of the Official Action is a Disparate Burden on Black Voters." While the trial court at least managed to organize its conclusions around the *Arlington Heights* framework, its compliance with Supreme Court precedent begins and ends there.

¶ 124    In its conclusions of law, the panel cites *Arlington Heights*, a forty-five-year-old Supreme Court case, a total of eleven times. It fails to cite *Abbott*, a four-year-old Supreme Court case, at all. It cites *McCrory*, a six-year-old Fourth Circuit case, a total of twenty times. It cites *Raymond*, a two-year-old Fourth Circuit case, a total of one time—and that citation is to a portion of *Raymond* that cites *McCrory* and is irrelevant to the holding or reasoning in *Raymond*. Similarly, the majority opinion

of this Court cites *Arlington Heights* twenty-nine times, *McCrory* thirteen times, *Abbott* seven times, and *Raymond* only four times.

¶ 125          Stated another way, the trial court completely ignored *Raymond* and *Abbott*, which could not be more on point. As noted above, the Supreme Court of the United States in *Abbott* reversed the decision of a three-judge panel because it imputed past discriminatory intent to the then-sitting legislature and thereby failed to presume good faith. In *Raymond*, the Fourth Circuit reversed the decision of the district court because it imputed the discriminatory intent of the 2013 General Assembly to the 2018 General Assembly and thereby failed to presume the good faith of the legislature that enacted S.B. 824—the legislation at issue in this case.

¶ 126          The order below does not even *mention* the presumption of legislative good faith, let alone apply it. In fact, one of the order's headings reads, "The Design of S.B. 824 Does Not Evince an Intent by the General Assembly to Cure Racial Disparities Observed Under H.B. 589." The Supreme Court's precedent is clear:

> The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. *Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.* The ultimate question remains whether a discriminatory intent has been proved in a given case. The historical background of a legislative enactment is one evidentiary source relevant to the question of intent. *But we have never suggested that past discrimination flips the evidentiary burden on its head.*

*Abbott*, 138 S. Ct. at 2324–25 (cleaned up) (emphases added).

¶ 127    The panel "made the same mistake as the panel in *Abbott* without even trying to distinguish the Supreme Court's holding." *Raymond*, 981 F.3d at 304. To rely so heavily on a Fourth Circuit case holding a prior law unconstitutional, while completely ignoring not only Supreme Court precedent, but also a Fourth Circuit case holding *this very law* constitutional, is error of the gravest kind. As in *Abbott*, "when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." *Abbott*, 138 S. Ct. at 2326.

¶ 128    Further, even if the panel had applied the correct burden of proof, the dissenting judge below correctly noted that the panel's factual findings are not supported by competent evidence and do not support the panel's legal conclusions.

¶ 129    First, plaintiffs failed to produce any witness who could testify to the General Assembly's alleged discriminatory intent or rebut the presumption of good faith. Representative Harrison, plaintiffs' own witness, testified that she "cannot say that racial bias entered into [passage of S.B. 824] and [she] would not say that racial bias entered into [passage of S.B. 824]." As aptly put by the dissenting judge below, "[i]f [p]laintiffs' own witness, who was in the General Assembly and actively participated in the passage of this legislation, did not then and does not now attribute the passage of S.B. 824 with any discriminatory intent, then this Court certainly will not either."

¶ 130    In addition, the panel's factual findings regarding both the sequence of events leading to the enactment of S.B. 824 and the legislative history of S.B. 824 fail to

properly consider and credit the crucial importance of the voter-ID amendment. Because this amendment created a positive constitutional duty for the General Assembly to pass a voter-ID law, enabling legislation was mandatory, not optional. The evidence plainly shows an intent to comply with the people's will and the North Carolina Constitution, not discriminatory intent.

¶ 131 Also, the panel's factual finding that S.B. 824 will result in disparate impact on the basis of race is wholly without evidentiary support. S.B. 824 allows *all* would-be voters in North Carolina to vote either with or without an ID. Plaintiffs failed to produce any concrete evidence that either they, or any other citizen of this state, would not be able to exercise their right to vote, or would otherwise be precluded from voting due to passage of S.B. 824. Any would-be voter can vote without an ID if they submit a reasonable impediment declaration, which may only be rejected if the county board of elections, after considering all relevant evidence in the light most favorable to the would-be voter, unanimously determines that the declaration is false.

¶ 132 It is undisputed that every legal vote should be counted. In a footnote, however, the majority seems to suggest that votes which are not lawfully cast should nonetheless be counted. This notion that the right to vote is somehow divorced from a voter's responsibility to comply with the law is troubling. As stated by the Supreme Court of the United States when reviewing an Indiana law requiring voter ID,

> A photo identification requirement imposes some burdens
> on voters that other methods of identification do not share.

> For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard. Burdens of that sort arising from life's vagaries, however, are neither so serious nor so frequent as to raise any question about the constitutionality of SEA 483; the availability of the right to cast a provisional ballot provides an adequate remedy for problems of that character.
>
> The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of SEA 483. The fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save the statute under our reasoning in *Harper,* if the State required voters to pay a tax or a fee to obtain a new photo identification. But just as other States provide free voter registration cards, the photo identification cards issued by Indiana's BMV are also free. For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.

*Crawford v. Marion County Election Board*, 553 U.S. 181, 197–98, 128 S. Ct. 1610, 1620–21 (2008).

¶ 133 Here, the burdens imposed on plaintiffs "arise[ ] from life's vagaries" and "are neither so serious nor so frequent as to raise any question about the constitutionality" of S.B. 824. *Id.*, 533 U.S. at 197, 128 S. Ct. at 1620. The panel below relied heavily on the fact that plaintiff Jabari Holmes, who has cerebral palsy, severe scoliosis, and who is paraplegic, may encounter difficulties in obtaining a free ID under S.B. 824.

Even if we ignore the fact that Mr. Holmes can still vote without an ID under S.B. 824, as discussed above, any assumed difficulties he *may* face in acquiring an ID have nothing to do with race. Such is the case with the other plaintiffs and their challenges. There is no evidence that Mr. Kearney's failure to present an ID in 2016 because he left it at home was related to race. Similarly, Mr. Smith's misplacement of his ID in 2016 was not related to race, nor was Mr. Culp's failure to present an acceptable ID in 2016. Setting aside the fact that any difficulties they are assumed to have encountered occurred under a prior law, the purported challenges were not attributable to race—and, regardless of their race, *all* of these plaintiffs can vote under S.B. 824 without identification.

¶ 134     As the dissenting judge noted below, "[t]here is no credible evidence that obtaining" a form of qualifying ID under S.B. 824 "entails significant financial cost." The record also contains "no evidence that any voter, in particular any African American voter, would be dissuaded from using" the reasonable impediment declaration process if they failed to obtain a qualifying ID.

¶ 135     Because the record is devoid of competent evidence supporting the panel's factual findings regarding the sequence of events, legislative history, and disparate impact, these findings should not be permitted stand. Therefore, this Court should reverse the panel's decision not only because it failed to apply the correct legal standard, but also because its factual findings are not supported by competent

evidence and cannot justify its legal conclusions.

¶ 136        The majority here declines to consider the competency of the evidence or the sufficiency of the factual findings below, accepting instead the conclusory findings of the panel without scrutiny. *Supra* ¶ 83. It is notable that this same majority, on this very day, is releasing an opinion in which it explicitly reweighs evidence, upends factual findings, and overrules legal conclusions made by a trial court. *See Harper v. Hall*, 2022-NCSC-121, ¶¶ 94–102. The logic-fluid view of factual findings from the trial courts in these two cases today demonstrates that the majority is more interested in outcomes than consistency.[4]

¶ 137        The majority also attempts to side-step the panel's disregard for Supreme Court precedent and cabin *Abbott*'s relevance by stating that the panel merely "us[ed] the historical background of the law as one piece of circumstantial evidence." *Supra* ¶ 38. As noted above, this is simply incorrect. The panel's deliberate choice of a heading, not simply a stray sentence, indicates the panel required "the General Assembly to Cure Racial Disparities Observed Under H.B. 589." It could not be any clearer—the panel "flip[ped] the evidentiary burden on its head" by imposing this

---

[4] The disparate treatment by the majority of the trial courts' factual determinations in these two cases seems contrary to Justice Earls' statement that she "really believe[s] it used to be that what we valued was consistency in our courts[.]" *'Ramifications are substantial.' How Republicans gained a lasting grip on the NC Supreme Court*, WRAL (Nov. 13, 2022), https://www.wral.com/ramifications-are-substantial-how-republicans-gained-a-lasting-grip-on-the-nc-supreme-court/20570554/.

requirement, and any assertion to the contrary is plainly wrong. *See Abbott*, 138 S. Ct. at 2325.

¶ 138 There is no legitimate jurisprudential basis for dismissing directly on point precedent from the Supreme Court of the United States. Where that Court has reversed a decision because the lower "court's references to the need to 'cure' the earlier Legislature's 'taint' [could not] be dismissed as stray comments," *id.*, and where the panel's decision in this case explicitly indicates that it is requiring the General Assembly to "cure" the sins of a past legislature, reversal is required.

¶ 139 The majority's treatment of *Raymond* is even more egregious. In a stunning effort to recharacterize and dismiss a directly on-point case, the majority refers to *Raymond* as a case that merely "determined that the constitutional amendment at issue 'served as an independent intervening event between the General Assembly's passage of [H.B. 589] and its enactment of [S.B. 824]." *Supra* ¶ 39 (alterations in original) (quoting *Raymond*, 981 F.3d at 305). The majority conveniently declines to acknowledge that *Raymond* did much more than that—the court in *Raymond* reversed a lower court's decision, which had ignored *Abbott* and the presumption of legislative good faith, and it specifically concluded that S.B. 824 was *not* passed with discriminatory intent. As with its discussion of *Abbott*, the majority chooses not to engage in any meaningful comparative analysis of *Raymond* or its key holding—that a trial court *must* presume legislative good faith and require plaintiffs to actually

carry their burden.

¶ 140        Finally, the majority opines that S.B. 824 is not necessary because there is no evidence of voter fraud. A simple search of the internet suggests otherwise. In fact, last month, Democrat Staten Island District Attorney Michael E. McMahon released a grand jury report detailing findings of fraud that occurred in a recent primary election. Michael E. McMahon, District Attorney, Report of the Grand Jury (2022), https://www.statenislandda.org/wp-content/uploads/2022/11/Grand-Jury-Report-49_compressed.pdf. The grand jury determined that there were "abundant opportunities for unscrupulous candidates (or those acting at their direction or on their behalf) to abuse the system without probable detection or criminal sanction cry out for remedy." *Id.*

¶ 141        In addition to changes in absentee ballot procedures and signature matching requirements, the report recommended that a government-issued identification be required before voting in person or by absentee ballot. *Grand Jury Finds Numerous Instances of Ballot Fraud in NYC Council Race on Staten Island*, New York Post (Nov. 22, 2022), https://nypost.com/2022/11/22/grand-jury-finds-numerous-instances-of-ballot-fraud-in-nyc-council-race-on-staten-island/. The majority cannot seriously contend that North Carolina is somehow immune from these abuses.

¶ 142        Reasonable regulations which are designed to protect election integrity, like those suggested in New York, not only deter unscrupulous individuals from taking

advantage of the abundant opportunities that exist to abuse the system, but they also promote public confidence in election outcomes.

### III.  Conclusion

¶ 143      "Fidelity to previous decisions," *'Ramifications are substantial.' How Republicans gained a lasting grip on the NC Supreme Court*, WRAL, would yield a far different result than that reached by the majority today.  A proper analysis pursuant to *Abbott* and *Raymond* would show that legal error infected the entirety of the trial court's decision.  Accordingly, this Court should reverse and remand to the trial court for application of the correct burden of proof and the proper presumption of legislative good faith.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.